A. M. CABRINHA *v.* HILO TRIBUNE HERALD, LIMITED.

No. 2493.

Submitted November 24, 1942.    Decided April 2, 1943.

Kemp, C. J., Peters and Le Baron, JJ.

OPINION OF THE COURT BY KEMP, C. J.

This is an action for libel, based upon an article which appeared in the Hilo Tribune Herald, a daily newspaper owned and published by the defendant. After alleging the corporate existence of the defendant and that it is and was at all times mentioned in the complaint engaged in the business of publishing and circulating the newspaper known as Hilo Tribune Herald and that said newspaper had at all times mentioned a general circulation throughout the Territory of Hawaii and elsewhere, and that the plaintiff was and is a resident of and deputy sheriff in and for the district of Hamakua, county of Hawaii, and the treasurer, secretary, director and stockholder in and of the Hawaii News Print Shop, Limited, printers and publishers of the Hawaii News, the complaint proceeds as follows:

"That at said Hilo, District of South Hilo, Island and County of Hawaii, on the 25th day of February, 1941, the defendant, Hilo Tribune Herald, Limited, in its Newspaper, did viciously, wickedly and maliciously and for the purpose of injuring the reputation, character and good name of the plaintiff herein, and with the purpose of bringing said plaintiff into disgrace, abhorrence, contempt, hatred, odium and ridicule among the people of the Territory of Hawaii and elsewhere and with the intent, wickedly, viciously and maliciously to injure said plaintiff did publish or cause or procure to be published in the said Hilo Tribune Herald, aforesaid, of and concerning plaintiff personally and as Deputy Sheriff aforesaid, the fol-

lowing false, libelous, malicious and defamatory words, matters and things to wit:

'AUDITOR'S ANNUAL REPORT GIVEN TO POLICEMAN-PUBLISHER

'A number of our subscribers who are incidentally citizens and taxpayers, have inquired during the past several weeks as to when we were going to publish the official report of the auditor of the county of Hawaii for 1940.

'After considerable investigation and research we found that this very important report, which contains the receipts and disbursements of this county, was given to the Hawaii News, a weekly publication to publish and appeared in the February 14 issue.

'Now we do not blame Deputy Sheriff-Publisher A. M. Cabrinha for playing politics and lobbying with the supervisors and trying to get all the county printing and newspaper advertising business he can for his publication, but we do object to a weekly being given preference over a daily newspaper with far greater paid circulation reaching more citizens and taxpayers in the publishing of this most important county advertisement of the year, the cost of which was approximately $500.

'It would not have cost the county a penny more to publish the auditor's report in The Hilo Tribune Herald which reaches over 5,000 homes daily and Sunday.

'Perhaps the supervisors had good reasons for desiring as few citizens and taxpayers as possible to read this auditor's annual report by handing it over to Publisher-Deputy Sheriff Cabrinha's weekly to publish. The police department, especially the sheriff and the deputy sheriffs, must have felt greatly relieved that the only reference to their salaries and auto allowances was the following ambiguous statement under PROTECTION TO LIFE AND PROPERTY: "Pay of Salaries and Operating Expenses Police Department $187,227.07." Nothing was disclosed

regarding the $175 monthly auto allowance of Sheriff Henry Martin, nor the fact that Deputy-Publisher Cabrinha receives a nice county house, a $200 monthly salary plus a $50 monthly auto allowance ($25 more than any other deputy in the country) while county patrolmen only receive from $80 to $100 basic monthly pay and $15 monthly auto allowances.

'It appears that the county fathers are still in pretty thick with the old county police machine and that once more the taxpayers and ordinary citizens are the losers along with The Tribune Herald, which in 1940 incidentally paid $5,500 in county and territorial taxes, and provided a payroll of $70,000 to its regular employees, 17 correspondents and 68 merchant carriers on Hawaii island.'

"That by said publication of said words and language, used and published by the said defendant as aforesaid, it intended to charge and assert, and to be understood as charging and asserting, and by the readers of said Newspaper was in fact and understood as charging and asserting, that plaintiff had corruptly and dishonestly played politics and lobbying with the supervisors, meaning the Board of Supervisors in and for the County of Hawaii, in trying to get all the County, meaning the County of Hawaii, printing and newspaper advertising business for his publication, meaning, The Hawaii News, newspaper printed and published in Hilo, Hawaii, by the Hawaii News Print Shop, Limited, a corporation; that, in printing and publishing the annual financial report of the Auditor of the County of Hawaii, in said The Hawaii News, plaintiff had and did corruptly and dishonestly falsify item in said annual report contained, to wit, 'Pay of Salaries and Operating Expenses Police Department $187,227.07 'Nothing was disclosed regarding the $175 monthly auto allowance of Sheriff Henry Martin, nor the fact that Deputy-Publisher Cabrinha receives a nice county

house, a $200 monthly salary plus a $50 monthly auto allowance ($25 more than any other deputy in the country) while county patrolmen only receive from $80 to $100 basic monthly pay and $15 monthly auto allowances.'

"That said charge, so made and published by the defendant, and so understood and by it intended to be understood by the readers of said newspaper, was and is false, scandalous and unprivileged, and did and does expose the plaintiff to hatred, contempt and obloquy, by imputing to him dishonesty and corruption, in soliciting and obtaining newspaper advertising business for The Hawaii News, and in corruptly and dishonestly falsifying the annual financial report of the Auditor of the County of Hawaii, printed and published in The Hawaii News, newspaper.

"That said issue of said newspaper containing said article and or Editorial was by the defendant widely circulated among the people of the District of South Hilo and vicinity, and throughout the County of Hawaii, and the Territory of Hawaii, and elsewhere, and said article and or Editorial was generally read by the subscribers of said newspaper and others, and was by them understood to have the sense and meaning aforesaid, and to charge the plaintiff with corrupt and dishonorable conduct, as hereinbefore stated."

Special damages are not claimed, only general damages being alleged.

The defendant interposed a general and special demurrer to the complaint, which was sustained. In sustaining the demurrer the court stated, in substance, that all facts well-pleaded must be accepted as true; that the words used are to be measured by their plain and ordinary meaning and as they would be ordinarily understood by an average, reasonable man, and that if an article is not libelous *per se*, it cannot be converted into a libel by innuendo not inferable from the words used in their ordinary

and usual meaning; in other words, that a cause of action cannot be begotten by innuendo.

Applying the foregoing to the allegations of the complaint, the court held that the words used are not in and of themselves libelous nor are they, considering the article as a whole, such that it may be properly inferred that they intimate plaintiff did anything corruptly and dishonestly and that the article is not only nonlibelous but is within the realm, scope and doctrine of fair comment. If the conclusion of the court, that the article was not susceptible of the inference that it charged plaintiff with corrupt and dishonest conduct and that without such inference it is not libelous, is sustained, the argument that the court erred in holding that it constituted fair comment on the conduct of a public official becomes immaterial and need not be considered.

. When plaintiff's opening brief was filed, the defendant moved that the bill of exceptions be dismissed for the failure of the plaintiff to comply with subparagraphs (b) and (d), paragraph 1, of rule 3 of the rules of this court which require that the opening brief contain (b) a statement showing that this court has jurisdiction to review the exception, judgment, decree or order in question, and (d) a specification of the errors which are relied upon. An alternative order was entered allowing the plaintiff ten days within which to amend his opening brief to include a jurisdictional statement and a specification of the errors relied upon and ordering that, in default of substantial compliance with the order, the bill of exceptions stand dismissed. Within the time allowed the plaintiff filed an amended opening brief which contains a jurisdictional statement and the following as a specification of the errors relied upon:

"Exception No. 1. The Trial Court erred in sustaining the demurrer of the defendant."

"Exception No. 2. The Trial Court erred in rendering and entering a judgment in favor of the defendant and dismissing the complaint."

The defendant now contends that the specification of errors incorporated by plaintiff in his amended opening brief does not substantially comply with rule 3 (d) and that the bill of exceptions should be dismissed. Prior to the opinions in *Ter.* v. *Taok,* 33 Haw. 560, and *Watumull* v. *Tax Commissioner,* 34 Haw. 84, rule 3 required the opening brief to contain (b) "A specification of the exceptions or assigned errors which are relied upon." Rule 3 has since been amended and in its present form contemplates more specific statements of the errors relied upon than did the original rule. The specification of errors contained in the amended opening brief is just what the rule required before it was amended, but falls short of strict compliance with the present rule.

However, the rule prescribes no penalty for failure to comply with its provisions and since the issues in the instant case are few and can be readily gathered from the complaint, the demurrer and the decision (all incorporated by reference in the bill of exceptions), we decline to impose the harsh penalty of dismissing the bill of exceptions and shall consider the questions raised by the argument.

The plaintiff argues that the publication is, without reference to the innuendo, libelous *per se.* He says this is so because, as he alleged in his complaint and now argues, it charges him with corruptly and dishonestly falsifying an item in the annual report of the auditor referred to in the publication, and also because the publication charges him with playing corrupt and dishonest politics and with indulging in corrupt and dishonest lobbying activities with the board of supervisors.

The trial court ruled adversely to both of these contentions. Certainly nothing contained in the article is

susceptible of the interpretation that the plaintiff or anyone else was being charged with falsifying the auditor's report. The language relied upon by the plaintiff to establish his claim that he is so charged is susceptible of no other meaning than that the auditor omitted from his report the details of the expense of the police department, at the suggestion of the supervisors; that perhaps the supervisors had good reason for causing the report to be printed in the weekly newspaper of small circulation published by plaintiff instead of in the Hilo Tribune Herald, a daily publication with a large circulation, and suggests as their reason that they wanted as few citizens and taxpayers as possible to have an opportunity to read it. The further discussion of the subject of the police department is to the effect that the police department, especially the sheriff and the deputy sheriffs, must have felt greatly relieved that the report omitted details as to their salaries and automobile allowances, and concludes as follows:

"Nothing was disclosed regarding the $175 monthly auto allowance of Sheriff Henry Martin, nor the fact that Deputy-Publisher Cabrinha receives a nice county house, a $200 monthly salary plus a $50 monthly auto allowance ($25 more than any other deputy in the country) while county patrolmen only receive from $80 to $100 basic monthly pay and $15 monthly auto allowances." All of the foregoing was clearly a criticism of the conduct of the board of supervisors and not of plaintiff. A reader of average and ordinary intelligence knows that the salaries and allowances of county officials are fixed by the board of supervisors and not by the officers themselves. The plaintiff cannot render the publication libelous by imputing to it a meaning of which it is not susceptible. (*Baldwin* v. *Tribune-Herald*, 30 Haw. 610, 618.) The language used is not susceptible of the meaning imputed to it by plaintiff and without such imputation, if it libeled anyone,

it libeled the members of the board of supervisors and not the plaintiff.

The portion of the publication which directly bears on the contention of plaintiff that he is charged with playing corrupt and dishonest politics and with indulging in corrupt and dishonest lobbying activities with the board of supervisors consists of the third and final paragraphs of the publication. It is clear that the third paragraph of the publication does imply that plaintiff played politics and lobbied with the supervisors in order to secure the job of printing the auditor's report. It may be said that, standing alone, its language does not permit of the implication that there was anything corrupt or dishonest in the conduct of the plaintiff. However, the publication must be considered as a whole; and particularly the third paragraph must be read in connection with the final paragraph wherein it is said: "It appears that the county fathers are still in pretty thick with the old county police machine and that once more the taxpayers and ordinary citizens are the losers along with The Tribune Herald."

The complaint alleged that the plaintiff was the duly appointed, commissioned and acting deputy sheriff of the district of Hamakua and was also the treasurer, secretary, a director and a stockholder in the Hawaii News Print Shop, Limited; that the defendant, in and by the article complained of, maliciously and for the purpose of injuring the reputation and good name of the plaintiff published the article hereinabove set out, of and concerning him personally and as deputy sheriff; that the defendant intended by said article to charge and assert, and to be understood as charging and asserting, that plaintiff had corruptly and dishonestly played politics and lobbied with the supervisors to get the job of printing the annual financial report of the auditor of the county of Hawaii in the Hawaii News, and that he did corruptly and dishonestly falsify an item

in said annual report. He also alleged in his complaint that the charges so made and published by the defendant, and so understood, and by it intended to be understood by the readers of said newspaper, were and are false and did and do expose plaintiff to hatred, contempt and obloquy, by imputing to him dishonesty and corruption in soliciting and obtaining newspaper advertising for the Hawaii News, and in corruptly and dishonestly falsifying the annual financial report of the auditor of the county of Hawaii printed in the Hawaii News.

Funk & Wagnalls New Standard Dictionary defines the word "play" as "to put into operation in or as in a game, as one of the implements of the game; to use as a toy; trifle with." The same dictionary defines "politics" as "the branch of civics that treats of the principles of civil government and the conduct of state affairs; the administration of public affairs in the interest of the peace, prosperity and safety of the state; statecraft; political affairs in a party sense; the administration of public affairs or the conduct of public matters so as to carry elections and secure public offices; party intrigues; political wirepulling; trickery." The term "playing politics" therefore has a great variety of meanings. The meaning to be ascribed to it depends primarily upon the context. While it is the duty of the auditor of the county, under the provisions of section 2313, Revised Laws of Hawaii 1935, to publish the annual report under the provisions of sections 2833, 2851 and 2888, the board of supervisors may indirectly control the awarding of the contract and printing the same. The article complained of assumed that the board of supervisors possessed such control. In awarding contracts the supervisors are bound to exercise their judgment and discretion in the best interests of the municipality and should not be influenced by political pressure of private interests at the expense of the county. The

article in question charges that as a result of the letting of the contract for the printing of the auditor's report in the Hawaii News the taxpayers and ordinary citizens of the county were the losers. It also intimates that the contract was let as a result of the plaintiff playing politics and lobbying with the supervisors. The word "lobby" is defined by Funk & Wagnalls' dictionary as "To endeavor to secure the passage of (a bill or measure) in a legislative or deliberating body by influencing as an outsider the votes of members." An annotation says, "In theory, lobbying is entirely legitimate; the secrecy of the process, however, is conducive to irregularities, * * * ." Playing politics and lobbying may be legitimate. On the other hand, either may—as shown by the definitions above—be dishonest and corrupt or have corrupt and dishonest tendencies.

The term "playing politics" has not, so far as we are aware, had judicial construction. The term "lobbying," however, has had such construction but only in connection with contracts. In *Drummond* v. *Steele*, 11 F. (2d) 595, in discussing the validity of the contract of Steele to procure the passage of ordinances, the court said: "It is suggested that the contract between Drummond and Steele was void, because it was in contravention of public policy, in that it embodied the idea that the parties to it by their undertaking to procure the passing of ordinances granting rights of way agreed to influence legislation. We do not understand that an agreement to secure legislation for legitimate purposes, and in a legitimate manner, is against public policy, nor unless that agreement by its terms or by necessary implication requires performance of acts which are of a corrupt character, or which have a corrupting tendency. 6 R. C. L. 732."

In *Powers* v. *Skinner*, 34 Vt. 274, 80 Am. Dec. 677, 678, the court said: "Courts of justice have, with jealous care, endeavored to protect every branch of the government

from all illegitimate and sinister influences and agencies; and it has been settled by a series of decisions, uniform in their reason, spirit, and tendency, that an agreement in respect to services as a lobby agent, or for the sale by an individual of his personal influence and solicitations to procure the passage of a public or private law by the legislature, is void as being prejudicial to sound legislation, manifestly injurious to the interests of the state, and in express and unquestionable contravention of public policy: * * * but he cannot with propriety be employed to exert his personal influence, whether it be great or little, with individual members, or to labor privately in any form with them, out of the legislative halls, in favor of or against any act or subject of legislation."

In *Clippinger* v. *Hepbaugh*, 40 Am. Dec. 519, 522, the court said: "The whole reasoning of the court, however, goes to establish these propositions, which cannot be reasonably denied. * * * That a contract to procure or endeavor to procure the passage of an act of the legislature, by any sinister means, or even by using personal influence with the members, would be void, as being inconsistent with public policy and the integrity of our political institutions."

In *Harris* v. *Roof's Executors*, 10 Barb. 489, 494 (Sup. Ct. N. Y.), the court said: "But it is the duty of every legislative body, and every member of it, to give all proper and necessary attention to the business before it. It is to be intended that 'the legislature always have truth and justice before their eyes.' (*Plowd.* 398.) And it certainly would imply a most unjustifiable dereliction of duty to hold that the employment of individuals to visit and importune the members, is necessary to obtain justice. Such practices would have a tendency to prevent free, honorable and correct deliberation and action of this most important branch of sovereignty."

While all of the foregoing cases were dealing with the question of the validity of a contract entered into for the purpose of lobbying, the implications to be drawn from said decisions apply to our situation and brand the practice of lobbying as being against public policy. If the article is susceptible of the defamatory meaning which the plaintiff has ascribed to it; *i.e.*, if a reader of ordinary and average intelligence might so understand it, the article is libelous *per se* and special damages need not be alleged. From a reading of the article as a whole and as it might be understood by the reader of ordinary and average intelligence, it is susceptible of two meanings: one defamatory and the other innocuous. Certain it is that the language of the article cannot be held to be susceptible of but one meaning, and that a harmless one. It should therefore have been left to the trier of the facts to decide whether the terms "playing politics" and "lobbying" were used in the article as implying that the plaintiff, in order to secure from the board of supervisors a contract for the Hawaii News Print Shop, Limited, to print the auditor's report, resorted to and used means either corrupt in themselves or having corrupt tendencies. Identifying the plaintiff as the deputy sheriff and as a member of the "county police machine" with which the "county fathers are still in pretty thick," and implying that he played politics and lobbied with the supervisors makes the article susceptible of the meaning that he used the political power of the machine to secure the approval of the board of supervisors to the awarding of said printing contract. The charge that by such award the taxpayers and ordinary citizens of the county were the losers is susceptible of the implication that either by an excessive price for the printing, or otherwise, the taxpayers of the county were the losers. (*Bonestell* v. *Shaw*, 28 Cal. App. 226, 151 Pac. 1149.) The statement of the author of the article com-

plained of that "we do not blame" the plaintiff "for playing politics and lobbying with the supervisors and trying to get all the county printing and newspaper advertising business he can for his publication" does not nullify the implications contained in the remainder of the article. We cannot know what induced the writer of the article to excuse conduct which was susceptible of a meaning defamatory of the plaintiff.

It has been argued, and the circuit judge held, that the article constitutes fair comment upon the conduct of a public official. The admitted or proved conduct of a public officer is a legitimate subject of critical comment, but the privilege of critical comment does not include the right to make and publish false allegations of fact. For the purpose of the demurrer, we must accept the facts well-pleaded to be true. The plaintiff admits his public character but alleges falsity of the charges made against him. The doctrine of fair comment can only avail the defendant if on the trial the allegation of falsity is not sustained by the proof. (*Territory* v. *Ota*, 36 Haw. 80.)

The demurrer should be overruled and the defendant called upon to answer. The trier of the facts might find the article innocuous but plaintiff is entitled to an opportunity to defend himself against the aspersions which he claims the article contains. The exceptions are sustained.

*W. C. Achi* for appellant.

*Anderson, Wrenn & Jenks* and *J. P. Russell* for appellee.