[Crim. No. 2371. First Dist., Div. Two. Dec. 20, 1945.]

THE PEOPLE, Respondent, v. STANLEY W. DUNCAN, Appellant.

James A. Toner for Appellant.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Harding McGuire, Assistant District Attorney, for Respondent.

NOURSE, P. J.—Defendant appeals from a judgment entered on a jury verdict finding him guilty of second degree

murder, and from the denial of his motion for a new trial.

Soon after the beginning of the late war the defendant left his employment with an oil company and entered the United States Army where he attained the rank of major and was assigned to the duties of oil transportation in the army offices located at 200 Bush Street, San Francisco. Employed in the same offices and assigned to Major Duncan was one Dorothy Vivell, a woman of about thirty-five years, who had been divorced in 1937, and who was the mother of two girls nine and ten years of age. Major Duncan was a man of about forty-seven, married, with a wife and daughter residing at the Duncan home in Glendale. The major and Mrs. Vivell soon began to associate outside the office and for more than a year their relations were intimate—at his apartment in San Francisco, at hers, and at a summer resort in the northern part of the state.

The relations reached the stage where the parties agreed that if the major could procure a divorce from his wife the parties would be married. The wife appeared unexpectedly at the defendant's apartment on the evening of January 27, 1945, and the three parties met on the 30th and discussed at great length the involvement in which they found themselves.

Some time after eight p.m. Mrs. Pisano, a close friend of the deceased, was called in as a sort of referee or arbitrator. What occurred on that occasion is best told through Mrs. Pisano's testimony.

"Well, when I was greeted at the door they were—all three of the parties were quite, oh, excited, hysterical; they were all pretty well intoxicated; and they said they were cleaning up a big mess, and asked me to sit down and hear it more or less as a judge and decide for them what they ought to do.

"Dorothy said to me, Oh, to the effect that she liked Mrs. Duncan and that she was willing to give up Dunk; and Mrs. Duncan also said the same thing: That she was perfectly willing to give the major a divorce. So I said, 'Well, then, the question seems to remain up to the major what he wants to do.' And I asked the major if he wanted to marry Dorothy or if he wanted to stay on and live with his wife. He wouldn't answer. He said, 'Let me wait until tomorrow and let me think it over.' And I said, 'Well, do you mean to say that you don't love Dorothy and that you want to remain with your wife?' He said, 'No, I still love Dorothy.' And I said, 'Well, it looks

like you loved two women.' And he said, 'I guess that's about right.'

"... And I suggested to Mrs. Duncan for her to stay and that I would take Dorothy home; that I would see to it to the best of my ability that Dorothy went some place else. And I said that I would try through my mother, perhaps, to get Dorothy a job away from San Francisco so she would not have to see the major any more and the major would not have to see her, and everything would be fine—I mean Mrs. Duncan and Mr. Duncan could go back to living with each other and it would just be forgotten as a very unfortunate circumstance. And he said, 'Well, I don't think that is necessary for her to transfer or leave; I am going to get a transfer.' "

Mrs. Duncan left for her home in Glendale on February 4th and on the following day Mrs. Vivell notified the defendant that she had an opportunity of employment in Sacramento which she desired to take, but the defendant urged her not to do so. He told her that if she stayed where she was he believed that the family relations would be adjusted.

Mrs. Vivell accompanied the defendant to his apartment at about noon of that day where the two remained throughout the afternoon and early evening continuously drinking brandy. Some time about 2:30 p.m. defendant took a tablet of seconal for a "headache and nervousness." He testified that he could remember nothing after 4 p.m. until he awakened in the hospital on the morning of February 8th. At about 9:30 p.m. of the night of February 5th he answered a telephone call from a business associate of his living in Burlingame, at which time he told his friend that "Dorothy (meaning Mrs. Vivell) was gone, or Dottie was gone, she was dead; that he had killed her." At 9:07 p.m. of the same evening the defendant placed a long distance call for his wife at Glendale. This call was completed at 9:23 p.m. and Mrs. Duncan talked with both the defendant and Mrs. Vivell. At 9:52 p.m. defendant placed another call to his wife in Glendale and connection was made at approximately 10:21. In this conversation the defendant informed his wife that Dorothy was dead.

In some manner not disclosed in the record the police learned of the trouble and when they arrived at the apartment they found the doors locked and bolted from the inside. They made entry by breaking a window and upon entering the living room found Dorothy Vivell sitting on a couch, and the defendant lying on the floor unconscious, presumably from an

overdose of sleeping powders. The deceased had been stabbed through the heart with a sharp instrument, no evidence of which was found in the apartment. The officers did find a scabbard in one of the closets which was used to hold a hunting knife. Such a knife was found the following day on the roof of an adjoining apartment house underneath the bathroom window of appellant's apartment. It had been wiped clean and oiled but upon examination traces of human blood were found upon it. The deceased was dead when the officers arrived. The defendant was taken to the emergency hospital where he was found to be near death from an overdose of sleeping powders. On February 7th at 5:45 a.m. an entry was made on his chart that he was not yet rational; at 11 a.m. of that day the attending physician informed the police inspector that it would be all right for him to interview the defendant. At 1:15 p.m. of that day two police inspectors, a stenographer and a deputy from the district attorney's office talked to the defendant in his hospital room. They testified that he then appeared normal and rational. They asked him about the various telephone calls made on the night of the killing and showed him the knife which they had found on the roof of the adjoining apartment house. In this conversation the defendant recalled the conversation with his wife and the deceased heretofore mentioned; his telephone conversation with his friend in Burlingame on the night of the 5th; his trip with his wife to the airport on Sunday and his conversations with deceased on the afternoon and evening of February 5th. He identified the scabbard of the hunting knife as belonging to him, but did not admit that the knife was his. He was shown a picture of the deceased sitting upon the couch, a picture taken after her death, and was informed that she had passed away and that a knife had been plunged through her heart. He then stated: "Well, I stuck her with a knife but I didn't think I stuck her very deep."

The defendant objected to the admission of the evidence of this confession on the grounds that he was unconscious at the time or that he was in such a mental condition as the result of drugs that he did not understand what he was saying. The court left the question to the jury. Considerable evidence was offered on both sides tending to show the mental condition of the defendant and the effect of the drug which he had taken. For the defendant, expert testimony was offered tending to

show that the defendant was in a continued state of coma from about four p.m. of February 5th until some time on February 8th after the statement had been made to the police authorities. For the state, expert testimony was offered tending to show that a period of coma or unconsciousness resulting from the use of seconal would not possibly extend for more than 36 hours after it had been taken. Expert testimony was also given tending to show that the effect of seconal, particularly when used with intoxicating liquors, was that certain inhibitory fibers of the brain would be released so that the person would be unable to falsify and would therefore be more apt to tell the truth than if he were fully conscious and free from the effects of the drug.

■ The first ground assigned by appellant is that the court erred in admitting the evidence of appellant's confession. The assignment relates only to the testimony of the police inspector covering his conversation with appellant two days after the homicide. No objection was made to the testimony of the witness detailing a like confession made by appellant on the night of the homicide and that confession of guilt stands unattacked. The grounds of the objection are that appellant was unconscious or comatose and did not understand the purport of the conversation. Wide latitude was given appellant to make that showing, but the evidence to the contrary was unimpeachable. Throughout the trial the appellant contended that he remembered nothing after about four p.m. of February 5th until he "awoke" in the hospital sometime on February 8th. During that period he was shown to have dialed the telephone and placed local and long distance calls, to have answered the telephone and engaged in conversations, and to have recalled the names of friends who had visited him in the hospital and the conversation he had had with them. Expert testimony was given by both sides as to the effect of seconal as to the capacity, or inclination, of the individual to tell the truth or to tell falsehoods while under its influence. Positive evidence was given that the effect of the drug was completely eliminated within a maximum of thirty-six hours after it had been taken, and ordinarily within a period of two or three hours. The conversation with the police inspectors was held approximately forty-eight hours after the drug had been taken. The testimony was that appellant's mind was then clear and that, before the confession was made, he was frequently asked if he was "all right" and if he felt in con-

dition to talk with them, and that he answered in the affirmative.

In essence, all that is said in argument on the point goes to the weight of the evidence, and not to its admissibility. Whether the confession was voluntary was left to the jury under an instruction that it must determine from all the circumstances connected with the confession whether it was entitled to weight and credibility. The rulings of the trial court on this issue were in full accord with the principles followed in *People* v. *Lehew*, 209 Cal. 336, 341 [287 P. 337] ; *People* v. *Dias,* 210 Cal. 495, 499 [292 P. 459] ; *People* v. *Rucker,* 11 Cal.App.2d 609, 612 [54 P.2d 508] ; *People* v. *Hoyt*, 20 Cal.2d 306, 314 [125 P.2d 29]. Appellant's criticism of the conduct of the district attorney and "his abettors" in taking the confession and offering evidence of it is wholly unjustified by anything appearing in the record.

Appellant complains of the ruling permitting the witness Dr. Proescher to testify in rebuttal that a person under the influence of barbiturate drugs such as seconal would be unable to tell a falsehood—or would be more apt to tell the truth. The testimony was in response to that of Dr. Catton who was called by the defense to testify that such a person would be given to fantasy and more apt to tell that which was untrue. The purpose of Dr. Catton's testimony was to show that when the appellant stated to his friend on the night of the homicide, and to the police inspectors two days later that he had stabbed the deceased, he was impelled by the drug to engage in fantasy and to boast of a murder which he had not in fact committed. It was in line with the old question, which has never been answered satisfactorily and which is founded on the aphorism "in vino veritas," whether a person is more apt to tell the truth when he is drunk than when sober. Fantasy may lead to braggadocio, but seldom to the confession of a murder in which the party had no hand. When this is done the condition is more apt to be insanity than mere coma. However, the appellant tendered the issue and he cannot complain that the State met it by adverse testimony.

The appellant complains that he was not permitted to show by the testimony of deceased's former husband that deceased was an habitual drinker and had threatened suicide. The testimony was excluded as too remote. The ruling was sound. The parties had been divorced in 1937. The homicide

was committed in 1945. The excessive drinking by deceased and appellant was carried down to the very point of the homicide. Threats of suicide made prior to the divorce had no bearing on the issues of this case. The photograph in evidence which was taken at the time the homicide was discovered and which shows the deceased seated upright on the davenport, the condition of the apartment, and the discovery of the knife upon the roof of an adjoining building all preclude any possible inference that the deceased came to her death by her own hand. Any threat of suicide by the deceased made while living with her former husband could therefore have no part in this case.

The appellant assigns error in the admission of evidence of the intimate relations of appellant and deceased. It is said that this evidence tended to prove another crime—that of adultery. The theory on which the case was prosecuted was that the appellant had become so involved in his relations with the deceased that he deemed it necessary to either secure a divorce from his wife or get rid of deceased. This evidence was pertinent to that theory and tended to prove a motive for the homicide. Evidence of the commission of other crimes is admissible for that purpose. (*People* v. *Kynette,* 15 Cal.2d 731, 746 [104 P.2d 794] ; 20 Am.Jur. pp. 293 et seq.; 22 C.J.S. pp. 1089 et seq.

Finally, it is argued that the court erred in admitting a hunting knife in evidence and in permitting it to be exhibited to the various witnesses and to the jury. The ground of the objection seems to be that the knife was not properly identified and *People* v. *Hill,* 123 Cal. 571 [56 P. 443] is cited for the statement that where there is "no evidence to identify" the instrument as the one used in the commission of the crime it was error to admit it in evidence. Respondent does not quarrel with the rule stated but denies its relevancy to this case. Here the appellant admitted ownership of a knife similar to the one offered in evidence. This knife was found on the morning following the homicide on the roof of an adjoining apartment house underneath the bathroom window of appellant's apartment. The scabbard fitting the knife and also offered in evidence was found in a closet of appellant's apartment on the top of a canvas zipper bag. The manager of the apartment house saw a similar knife on appellant's dresser some time prior to the day in question. Dr. Bostich, the autopsy surgeon, testified that this knife might easily be the one used. Dr. Carr, the pathologist in the coroner's office, testified that the knife had been recently cleaned and oiled but when tests were made

it showed evidence of human blood spots. A daughter of the deceased testified that appellant had given such a knife to her mother while they were spending their vacation together during the preceding summer and that he demonstrated to the deceased how it could be used on another person. The case is in line with *People* v. *Hightower*, 40 Cal.App.2d 102, 107 [104 P.2d 378], where the court said, "The fact that there was testimony that the gun introduced in evidence was similar to one of those used in the robbery, coupled with the fact that it was found on the premises where appellant had resided, sufficiently satisfies the rules of law to warrant its reception into evidence." (Citing numerous cases.)

The judgment and order are affirmed.

Goodell, J., and Dooling, J., concurred.