[Crim. No. 4409. Second Dist., Div. Three. Apr. 25, 1950.]

THE PEOPLE, Respondent, v. CECIL R. POLLUM, Appellant.

Stahlman and Cooper, George Stahlman and Percy V. Hammon for Appellant.

Fred N. Howser, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

SHINN, P. J.—Appellant Pollum, a chiropractor, and one Dr. Kirk were jointly indicted for four offenses of abortion, three of the subjects being married women and the fourth a single woman. Appellant was tried separately to a jury and was convicted on all counts. He was denied probation and sentenced to state prison. He appeals from the judgment and from an order denying his motion for a new trial. Four grounds of appeal are urged: (1) Insufficiency of the evidence as to each count; (2) error in admission as exhibits of certain surgical instruments; (3) error in the receipt of testimony of a physician as to alleged customary medical practices; (4) prejudicial argument of the prosecutor with respect to appellant's failure to testify.

The claim of insufficiency of the evidence relates to the testimony of the four women descriptive of the acts and statements of appellant and also to the testimony relied upon for corroboration. ■ The evidence disclosed the following: The first woman was the mother of two children, 10 and 12 years of age. She was pregnant, had lost 15 pounds in weight, and was in an anemic condition. She had been advised by a physician, other than appellant, that she could not undergo a normal childbirth and that a Caesarean operation would be necessary. She believed this to be true and was greatly concerned about her health. Notwithstanding these facts she was

able to do her housework and was otherwise in good health. She consulted Dr. Kirk and was referred to Dr. Pollum. She and her husband went to appellant's office. In the presence of her husband the wife told appellant she was pregnant and had lost 15 pounds of weight. She testified that she believed at that time her life was in danger if ''she went through with this pregnancy'' and that she so informed appellant. She testified that one of her objections to a Caesarean operation was that ''caesarean sections do cost a good deal of money.'' The husband and wife arranged with appellant for an abortion and the husband paid him $250 in cash for which no receipt was given. The husband testified that his wife appeared to be in good health at the time but when she came out of appellant's operating room she was pale, in a hysterical condition and almost unable to stand. The husband also testified that he did not remember that his wife told appellant she feared for her life if she went through with the pregnancy although she did tell him she was under the impression she was unable to have the child. A few days later she was relieved of her condition of pregnancy. The testimony of the woman left no room for doubt that an abortion was performed. While corroboration was necessary (Pen. Code, § 1108) the testimony of the husband was sufficient for that purpose, although, under the evidence, he was an accomplice. (*People* v. *Wilson,* 25 Cal.2d 341 [153 P.2d 720] ; *People* v. *Clapp,* 24 Cal.2d 835 [151 P.2d 237] ; *People* v. *Collins,* 80 Cal.App. 2d 526 [182 P.2d 585] ; *People* v. *Seiffert,* 81 Cal.App. 195 [253 P. 189].)

It is earnestly contended by appellant that there was insufficient evidence from which the jury could conclude that the abortion was not necessary to preserve life. We cannot agree that the evidence was legally insufficient.

 The second woman testified she had missed one period and did not believe she was pregnant. She had consulted Dr. Kirk three or four weeks before she saw appellant as directed by Dr. Kirk. Her health was good. She was accompanied to appellant's office by a man for whom she worked. He had not known appellant before that time. Both the man and the woman testified that the woman paid appellant $300 in cash and went into another room with him. The woman testified she was on an operating table 15 or 20 minutes and the man testified that in about 30 minutes she came out pale, nervous and almost hysterical. The woman's testimony as to appellant's acts was sufficient to prove the performance of an abortion. Al-

though she testified that she told appellant she did not believe herself to be pregnant, appellant's charge of $300 clearly indicated that he did not share her belief. Moreover, the payment of such a sum and her submission to the operation cast doubt upon the professed belief of the woman that she was not pregnant. ▮ And it is not a necessary element of the offense that pregnancy should exist or that a miscarriage be accomplished. ▮ If appellant committed the acts testified to by the woman with intent to procure a miscarriage he committed the offense charged. The circumstances testified to by the woman and corroborated by the man constituted legally sufficient evidence to support the conviction.

▮ The third woman did not want to have a baby because her husband was subject to epileptic fits. She testified she was in good health. A physician who had examined her testified she was pregnant and that no reason was discovered why she could not safely undergo a natural childbirth. She was accompanied to appellant's office by her mother. The two women testified they arranged with appellant for an abortion and paid him $250. The testimony of the daughter was sufficient to prove the commission of the offense charged and was sufficiently corroborated by that of her mother.

▮ The fourth woman was unmarried. She testified that she was pregnant but in good health. She was taken to appellant's office one evening by Dr. Kirk where arrangements were made for an abortion. She paid no money to either of the men but promised to make payments each week until the fee was paid. According to her testimony Dr. Kirk administered an anesthetic; she became unconscious but recalled that at times she was screaming and crying. Her description of the acts performed by appellant in the presence of Dr. Kirk was sufficient to prove an attempt to procure a miscarriage. After the operation and while she was semiconscious she jumped off the operating table and ran out of the building into the street, completely nude except for her shoes. She ran across the street screaming, where she met persons who testified at the trial. Dr. Kirk and appellant followed her with a sheet which they wrapped around her. It had a splotch on it which resembled blood. A woman wrapped a coat around her; the police were called and the subject was taken to the police station accompanied by the doctors. Dr. Kirk brought the woman's clothing and she dressed in the police station. She was in a highly emotional and incoherent state. The doctors were questioned and stated that the woman was undergoing

a minor female operation, the nature of which Dr. Kirk said he preferred not to disclose. He said the woman came to the office voluntarily and was under the influence of an anesthetic when she ran out of the building. Police officers testified that appellant was present, although Dr. Kirk was questioned and did the talking, while appellant said nothing. A police officer testified that he arrested appellant and made a search of his office. He found a small hypodermic syringe and needle, a vaginal speculum, a sound, and a cervical dilator. When questioned appellant said that as a chiropractor he was entitled to use the dilator; he' pointed out that it was rusty and said he had not used it for a long time; that the sound was used to determine the depth of wounds and that as a chiropractor he was not entitled to use the hypodermic syringe. The operation was one in which the doctors considered it advisable to administer an anesthetic. The woman's hysterical condition, although no doubt due in part to the anesthetic, also could have indicated that she had been through a severe ordeal. There was, in our opinion, sufficient corroboration. (Cases cited *supra*.)

█ The surgical instruments above mentioned were received in evidence over the objection of appellant. It is claimed this was error inasmuch as they were found in appellant's office more than a year after the times of the alleged offenses and were not shown to have been used by appellant upon any of the women. As already stated there was testimony that appellant admitted they belonged to him. There was also testimony that some of the women had been given hypodermic injections and that vaginal instruments of some sort had been used upon them. It is true that the discovery of the instruments in appellant's office was remote as to time but we do not regard the case as one in which it was necessary in order to render them admissible that evidence should have been produced from which it could reasonably be inferred that they had some connection with the commission of the crime. (See *People* v. *McCall*, 10 Cal.App.2d 503 [52 P.2d 500].) If it had been necessary to produce such evidence in the present case there was a failure of such preliminary proof. But it was not necessary to connect the instruments with the⁴commission of the acts charged to render them admissible in evidence. Possession of the instruments was evidence that defendant's office was equipped for the performance of operations of the nature described by the witnesses. The testimony was that the cervical dilator was used only in surgery and is usually

found only in offices where surgery is performed. According to appellant's admission he was not qualified as a chiropractor to give hypodermic injections. When questioned by the arresting officer concerning the instruments, appellant stated that he had not used the dilator for a long time, and he justified his possession of the sound upon the ground that it was used to probe wounds. We think that under these circumstances the mere lapse of time between the commission of the alleged acts and the discovery of the instruments was not of itself a sufficient reason to require their exclusion from evidence. It could be inferred from appellant's remarks to the officer that he regarded them as essential to his practice and that they were not newly acquired. They were suitable for use in the operations described by the witnesses and this was sufficient to justify their admission. (*People* v. *Beltowski,* 71 Cal.App.2d 18, 23 [162 P.2d 59] ; *People* v. *Duncan,* 72 Cal.App.2d 247 [164 P.2d 313] ; *People* v. *Ramsay,* 83 Cal.App.2d 707, 719, 725 [189 P.2d 802] ; *People* v. *Gilman,* 43 Cal.App. 451 [185 P. 310] ; *People* v. *Lee,* 81 Cal.App. 49 [252 P. 763].) █ It was for the jury to determine from all the evidence what weight should be given to the fact that the instruments were found in appellant's office about a year after the commission of the alleged offenses. (*People* v. *Peete,* 54 Cal.App. 333 [202 P. 51] ; *People* v. *Nakis,* 184 Cal. 105 [193 P. 92] ; 22 C.J.S., § 712, p. 1209.)

█ Dr. Ethel Margaret Hamilton, a physician and gynecologist, testified for the People. She stated her qualifications, which were not questioned by counsel for appellant in the first instance. She was the physician who examined the third woman, found she was pregnant, and expressed the opinion that she could undergo a natural childbirth. She was questioned by the People as follows: ''What procedure is followed in performing such an operation, that is, one where it is necessary to preserve life.'' The question was objected to and the witness answered: ''The patient is hospitalized for the 24 hours before the dilatation and curettage is performed and is seen by two practicing physicians which are on a definite committee appointed by the hospital staff. These two physicians see the patient and determine by examination whether or not they feel the patient can go through with pregnancy or whether the pregnancy should be interrupted.'' A motion to strike the answer was made and the court stated ''I think it is proper to show what the regular medical practice is in the

community in question in regard to a particular case. The objection will be overruled.'' The witness had testified previously on the subject to the effect that she had performed operations in order to save life. She proceeded to tell of a particular case but was informed by the court that she was getting away from the subject matter. She was not shown to be familiar with the standard practice used by reputable physicians in performing operations to preserve life nor was it shown that such a standard practice existed in the community. So far as shown she was testifying only to cases within her own experience. Both the objection and the answer were upon the ground, among others, that no proper foundation had been laid for her testimony. Appellant's attorney stated, out of the presence of the jury: ''Judge, the doctor has not testified to the technical procedure, she has testified to the moral aspect of the thing, what doctors do to protect themselves'' to which the court replied: ''Which has been the standard of the medical profession as far back as I can remember. . . . All doctors, performing therapeutic abortions do get the opinion of other doctors, call other doctors in, at least two doctors in the hospital, doctors on the hospital staff. A man with hospitals available for performing an abortion in the privacy of his office without consulting another doctor is an indication of not performing a therapeutic abortion, a circumstance which goes to the weight and not to the admissibility. The objection will be overruled. Motion denied.''

The People seek to justify the admission of this testimony upon the ground that the question involved was the same as in a malpractice action, namely, whether the treatment administered was in accordance with the standard practice of reputable physicians in the community. It was not the same. No question of knowledge, judgment, skill or care was involved. The court instructed: ''An abortion is legal only when it is *apparently* necessary to save the life of the woman'' (emphasis added). It may be presumed that the jury, because of the instruction, would have acquitted appellant if it had determined the evidence to be insufficient to prove want of apparent necessity. If the jury accepted the testimony of Dr. Hamilton that doctors performing abortions in order to preserve life first receive the advice of two doctors appointed by a hospital staff, it would have weighed heavily against appellant. The concurring opinions and advice of two physicians, appointed for that purpose, are deemed essential to prove necessity to preserve life, and the absence of such advice is evidence of

nonnecessity. Such were the implications of the testimony. Whatever the usual practice may be in certain medical circles, the guilt of one accused of committing an abortion should not be deemed established by his failure to follow the practice.

Appellant's contention in this connection relates only to the case of the first woman, who described her condition to appellant and stated she was fearful for her life. The uncontradicted evidence was that the other women were in good health. (See *People* v. *Malone*, 82 Cal.App.2d 54 [185 P.2d 870].) We are of the opinion that the testimony concerning the described practices was prejudicial as to the first count.

■ The final contention is that improper comment was made by the prosecutor upon the failure of appellant to testify in his own behalf. The following statements were made during argument: "The defendant has not got on this witness stand here to explain or deny any of this evidence that has been piled up against him. The People's case stands absolutely uncontradicted in any way——." "Now, the defendant has seen fit to exercise his right under the Constitution to stay off of that witness stand and tell us or explain to us or make any of these denials." "Mr. Bowler: You know, ladies and gentlemen, in the olden days when the law was young, the defendant didn't have the right to get on that witness stand and explain the evidence that was within his knowledge or to contradict those who appeared against him." "Mr. Bowler: Ladies and gentlemen of the jury, as I said before, that used to be the law. Now, in the present day the defendant has two rights. Under the Constitution he has the right to stay off of that stand and not testify, and he likewise has the right to get on that stand and deny these accusations against him and explain the evidence that appears against him. He has seen fit not to do that. Now, which of those two rights are more valuable——." "Mr. Bowler: Which of those two rights is more valuable? If a defendant were innocent, I would say that the right to get on that stand would be the more valuable right, to get on that stand and deny, and have the privilege of explaining evidence that appears against him in any particular case." "Mr. Bowler: He has placed on your shoulders, ladies and gentlemen of this jury—he has placed on each and every one of you the burden and the responsibility of finding an explanation for the matters that these women have testified about in this case." "Mr. Bowler: Who knows better what took place out there—who knows better as to what happened to

Mrs. White, what happened to Carmen Lund, what happened to Mrs. Carter, and what happened to the other ladies who testified here—who knows better than the defendant Pollum? It is certainly within his knowledge as to what took place out there. Why, he was standing between these women's legs; why, he accepted all this money. What did he do?" "I am going to let Mr. Stahlman come up here and tell you how innocent his man is, and then I will devote a little time to answering what he has to say."

The foregoing argument was interspersed with objections by the defense and assignments of prejudicial misconduct, all of which were overruled. The court instructed the jury as to the significance of the failure of the defendant to explain or deny adverse testimony as to matters concerning which he would have had knowledge. The instruction was substantially in the language used by the court in *People* v. *Adamson,* 27 Cal.2d 478, 490 [165 P.2d 3], with respect to the consideration that should be given to the failure of the accused to explain or deny such evidence. There was no assertion by the prosecutor, as there was in *People* v. *Pianezzi,* 42 Cal.App.2d 265, 268 [108 P.2d 732], that the failure to testify was tantamount to an admission of guilt, which assertion, although approved by the District Court of Appeal, was subsequently disapproved by the court in the Adamson case. Neither was there an assertion that the failure of appellant to testify justified an inference or raised a presumption of guilt. The argument was to the effect that such failure warranted the jury in according more weight to the evidence of the prosecution because the testimony as to the conduct of appellant stood uncontradicted. It would seem reasonable to suppose that in following the court's instruction the jury would not have given less effect to the failure of defendant to testify than was suggested by the remarks of the prosecutor.

The judgment and order denying a new trial are reversed as to the first count of the indictment, and affirmed as to the remaining counts.

Wood, J., and Vallée, J., concurred.

A petition for a rehearing was denied May 10, 1950.