[Crim. No. 3418.  Second Appellate District, Division Two.—February 14, 1941.]

THE PEOPLE, Respondent, v. ELGIN CARSON, Appellant.

Earl Warren, Attorney-General, and Gilbert F. Nelson, Deputy Attorney-General, for Respondent.

Walter L. Gordon, Jr., for Appellant.

WOOD, J.—Defendant was charged by information with the crime of murder and was found guilty by a jury of murder in the second degree. He was also charged with a prior conviction of murder and this charge was admitted. He has appealed from the judgment of conviction.

The decedent and the defendant were twin brothers. In the evening of May 11, 1940, they were visiting at the home of their sister, Mrs. Willie Key, and as they came out of the house at "about dusk" they approached decedent's automobile which was parked at the curb and in which the wife of

decedent, Mrs. Reva Carson, was sitting. Mrs. Carson testified that as the two brothers came from the house they were carrying on an "ordinary conversation" but she could not understand what they were saying. She testified: "Well, they came out of the house and walked down the steps, and I called to my husband to come on, hurry up and let's go home. So he said all right, and then they walked on to the car. And then my husband started to go around the back end of the car, to go around to the driver's seat, and just as he went around the back of the car Elgin followed him, and instead of my husband getting in the car he started backing up, and I glanced toward the back and I saw Elgin opening his knife. . . . And then he (decedent) backed to the front of the car, and then whirled and ran. . . . He ran away from the defendant, and he followed him, and he caught up with him I think on the front porch, and there was a struggle on the front porch and my husband gave a blood-curdling scream, and about that time the front door opened, and my husband said to his sister, 'Willie, he has cut me to death,' and then he fell in the door."

The two men were similar in appearance and both wore grey suits. Defendant testified that he told decedent that he wanted to ride with him to 42nd Street but decedent told him that he could not do so because his wife might want to be taken somewhere. Defendant then told decedent that he wanted to go and started to open the rear door of the car. He further testified: "I started to open the door to get in and he said, 'Don't get in. I told you, don't get in, I can't take you.' And I asked him why. And in the meantime I had attempted to open the door, and he slammed the door and said—I turned around and I saw a knife in his hand, and when he slammed the door he said, 'Don't get in.' I said, 'What is the matter? You have a knife.' And he said, 'Yes, if you attempt to get in I will use it.' And in the meantime I backed up, and he was approaching me—I backed around on the sidewalk, and as we reached the sidewalk, I had in mind that I was afraid to turn my back to him—I didn't know, from the way he spoke—I hit at his wrist to try to knock the knife on the ground and run, and I missed it. So I ran myself, and when I ran I was aiming to go around my sister's house; but in the meantime we walked around together, and I jumped onto the porch, and when

I did, by the time I got to the porch, he was right there with me. And between the time that I left from the sidewalk up to the porch I had opened my knife out of my own pocket, and just the instant we hit the porch I felt a strike, and I felt a sting on my neck like that (indicating), and I clinched with him.'' Defendant further testified that they scuffled for a minute or two during which time he struck decedent and decedent was trying to strike him. Decedent fell and died five days later. Upon his body there was a long deep cut measuring seven inches in length extending across the upper left chest and a second cut fifteen inches long across the abdomen.

After decedent fell defendant went into the kitchen of Mrs. Key's house and cut his wrists with a butcher knife. He gave as a reason for doing this that he thought he was going to die from the wound in his neck and that he wanted to die quickly.

Mrs. Beulah Pruden, who lived next door to Mrs. Key, testified that she ran to Mrs. Key's house when she heard the commotion and saw decedent lying in the doorway. She stooped to render aid and saw two knives one on each side of decedent. One of these knives was brown in color and one was black. The prosecution presented several witnesses who testified that although present they did not observe any cut on defendant's neck.

Defendant contends that the trial court erred in refusing to give to the jury his proposed instruction No. XIV, which is as follows: ''You are instructed that in a criminal case the burden of proof is always upon the prosecution, and when a defendant produces evidence of self defense, it is only necessary for him to create by a preponderance of evidence a reasonable doubt as to his guilt to entitle him to an acquittal, and if you have such reasonable doubt as to his guilt in this case, it is your duty to find defendant 'not guilty' ''. No instruction was given by the court covering the principle involved in the proposed instruction but the court gave the following instruction which is in the language of section 1105 of the Penal Code: ''Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime

committed only amounts to manslaughter or that the defendant was justifiable or excusable''.

Respondent contends that since the court read to the jury section 1096 of the Penal Code on the subjects of presumption of innocence and reasonable doubt the matter was sufficiently covered and cites section 1096a, which provides that if section 1096 be read no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given. It is to be noted, however, that section 1096a provides that no further instruction *defining* reasonable doubt need be given. It is not provided therein that no other instruction on the *subject* of reasonable doubt need be given in any particular case. The Supreme Court has at various times given different interpretations to section 1105 of the Penal Code. In *People* v. *Hong Ah Duck,* 61 Cal. 87, the instruction under review was the following: ''When the killing is proved, it devolves upon the defendant to show any circumstances in mitigation to excuse or justify by a preponderance of evidence on his part. That is, the killing being proved, the defendant must make out his case in mitigation to excuse or justify by some proof stronger in some appreciable degree than the proof of the prosecution. The burden of proof changes. . . . It must be in some degree, no matter how small, stronger than the proof of the prosecution on the other side.'' The court held that the instruction was proper, citing several earlier California decisions. But in several later decisions the Supreme Court has withdrawn its approval of the doctrine of the Hong Ah Duck case. (*People* v. *Bushton,* 80 Cal. 160, 165 [22 Pac. 127, 549]; *People* v. *Post,* 208 Cal. 433, 437 [281 Pac. 618]; *People* v. *Elliott,* 80 Cal. 296 [22 Pac. 207]; *People* v. *Roe,* 189 Cal. 548, 550, 565 [209 Pac. 560].) It is now thoroughly established that under section 1105 it is necessary only that defendant produce evidence the weight of which is sufficient to create in the minds of the jurors a reasonable doubt as to the existence of the alleged circumstances which justified the homicide. The reading of section 1105 to the jurors without explaining to them the extent of the burden cast upon defendant would tend to create in their minds the impression that the obligation cast upon defendant was much greater than the obligation cast upon him as defined by the late decisions of the Supreme Court. Since an erroneous view of section 1105

was taken by the justices in the Hong Ah Duck and other cases it cannot be successfully argued that the jurors, without the aid of an explanatory instruction, could differentiate between the view expressed in the early California cases and the view expressed in the later cases and accurately determine the extent of the obligation cast upon defendant. Our views are in accord with the decision of the Court of Criminal Appeals of Texas, where, in *Cogdell* v. *State*, 43 Tex. Crim. Rep. 178 [63 S. W. 645, 647], it is said that "the court, in giving substantive defensive charges, should couple them with the reasonable doubt, to wit, if the jury believe, etc., or if they have a reasonable doubt with reference to the defensive matter, to give defendant the benefit of such reasonable doubt, and acquit him." ▮ The instruction under review is not in language which is to be commended but its fault lies not in the charge that it is too favorable to the accused but rather in the charge that it is not favorable enough. The words "by a preponderance of evidence" could well have been stricken from the instruction and as so stricken the instruction could well have been given.

▮ The court erred in refusing the request of defendant for the following instruction: "The Court instructs the jury that a person in the exercise of his right of self defense not only has a right to stand his ground and defend himself when attacked, but he may pursue his adversary until he has secured himself from danger." (*People* v. *Orosco,* 73 Cal. App. 580 [239 Pac. 82]; *People* v. *Kinowaki,* 39 Cal. App. (2d) 376 [103 Pac. (2d) 203].) Although many instructions were given on the subject of self-defense we find no instruction which concerns the right of one attacked to pursue his adversary until he has secured himself from danger.

▮ Defendant was entitled to have the jury instructed fully and correctly on all legal principles applicable to the facts shown in evidence, not only in evidence produced on his own behalf but also in evidence produced by the prosecution.

The judgment is reversed and a new trial is ordered.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied February 27, 1941, and respondent's petition for a hearing by the Supreme Court was denied March 15, 1941. Gibson, C. J., Curtis, J., and Edmonds, J., voted for a hearing.