## STATE OF HAWAII *v.* KATHRYN D. FOSTER.

### No. 4139.

AUGUST 16, 1960.

TSUKIYAMA, C. J., MARUMOTO, CASSIDY, WIRTZ AND LEWIS, JJ.

OPINION OF THE COURT BY WIRTZ, J.

Defendant-plaintiff in Error, Kathryn Dennison Foster, hereinafter referred to as "defendant" was indicted by the Territorial Grand Jury for Murder in the Second Degree, in March 1959, for the killing of her husband, Francis Cecil Foster, a retired Army Colonel.

On January 16, 1959, and for several years prior thereto, defendant and her husband lived in a two-story duplex apartment at 2003 Ala Wai Boulevard. The living room, kitchen and laundry area were on the first floor, while the bedrooms, one of which was used for storage, were located on the second floor.

At approximately 1:33 A.M., on January 17, 1959, James Edson, a hospital corpsman with the Hawaiian Armed Services Police, arrived at the apartment pursuant to a radio call. While opening the screen door he heard defendant saying "Help him, help him." "God help him, God help him." Upon entering, after the inner glass door was unlocked by her, he saw defendant and the nude body of decedent, lying on his back with his head resting on his right cheek, and plastic ice cube trays on his left cheek. He noticed two pools of blood on the living room floor, one of which was smeared while the other was "partially coagulated."

Edson's efforts to resuscitate the decedent proved futile and Dr. Richard Wong officially pronounced Colonel Foster dead upon his arrival at 1:55 A.M. The autopsy performed on deceased by pathologist Dr. Alvin Majoska disclosed a bullet wound in the midline of the neck in the back at the area near the hairline. The bullet had cut through the spinal cord at the first cervical vertebra immediately behind the skull, passing directly forward and lodging behind the left middle incisor tooth. The plane of the bullet's path was determined to be approximately parallel to the ground surface if the body had been in an erect position. The autopsy further revealed the presence, in the blood stream of deceased, of approximately three and a half milligrams of ethyl alcohol per cubic centimeter of blood.

Based on his findings and observations as a result of the autopsy, Dr. Majoska was of the opinion, as appears

evident from the nature of the wound that it was not self-inflicted; that the deceased was intoxicated and probably not conscious at the time of his death; that the fatal wound was not a contact wound nor the result of a ricochet; that death was almost instantaneous.

The fatal gun, a .38 calibre Colt revolver registered to decedent was discovered by Officer Cyril Gomes on the top shelf of the front bedroom closet. There was still a faint smell of exploded gunpowder and two fired shells and four cartridges were in the cylinder. In front of the closet the officer noticed a cloth covered chair with a depression in the seat.

No second bullet was located, although a bullet hole was discovered in the inner door with a corresponding hole lower down in the outer door of the living room. The outer door lower hinge was bulged slightly outwards.

Mrs. Ethel Carrilho, who lived next door in the same duplex with the Fosters, testified that she heard two loud reports about five or seven minutes apart between 10:00 and 10:30 during the evening of January 16 which sounded like the backfire of an automobile.

The testimony of Mrs. Carrilho and Victor Emiel another neighbor, indicated that the Fosters often quarreled, although no such quarreling was heard during the night in question. Mrs. Carrilho testified that defendant, about a month before the killing, had on at least two or three occasions threatened her husband, stating something about a gun and that she would kill him. Mr. Emiel stated that quite often, from anywhere after 8:00 P.M. till about 2:00 A.M., he had heard the loud and audible voice of a woman emanating from the Foster apartment telling the other person to "pack up and get out."

Edward Tom, employed at the Honolulu Police Department as a Crime Analyst Specialist and by stipulation accepted as an expert chemist and analyst as well as an

expert in ballistics, testified that from the chemical reagent applied to the wax impression taken of defendant's hands, he concluded that there was a small amount of nitrate present on the right hand. Similar tests conducted on the hands of decedent indicated a positive reaction on both hands. These tests simply indicate the presence of any substance containing nitrate such as "gunpowder," "tobacco ash," "fertilizer," and the like. No objection was made as to the inconclusiveness of these tests but an objection was made to the manner in which they were obtained. We assume, for the purposes of this opinion, that these tests are subject to the statutory requirement that they be voluntarily obtained.

Ballistics tests conducted by Mr. Tom identified the gun found by Officer Gomes in the bedroom closet as the fatal gun. Further tests indicated that deceased was not killed by a contact wound but that the weapon was fired at a distance greater than 15 inches from the wound.

Tests made by Mr. Tom on blood samples from the two pools, one of which was smeared, on the floor of the living room; the ewa wall on the stairway leading to the second floor; the floor of the kitchen and the wash tray in the laundry area; showed them to be of human blood and, upon comparison, of the same blood type as that of deceased.

From defendant's testimony both she and deceased had been drinking on the evening of January 16. Defendant recalls, at least, two drinks of bourbon poured over an ice cube. The deceased was a heavy drinker. He and his wife did little entertaining. Defendant testified that he "encouraged" her very frequently to drink, as often as two or three times a week, although she was reluctant to do so.

Defendant testified that the fatal gun had been purchased in Little Rock, Arkansas and that she had been

taught how to use it by deceased. She also stated that she did not know exactly where the gun was kept although she was aware of its general location and that the last time she had seen it was in the latter part of 1958.

She testified in some detail about the events that occurred from the time she arose on that fateful morning until shortly after the return of her husband from his walk early that evening. They then sat down for a pleasant conversation. After she had at least two drinks she felt drowsy. Her testimony was that her next recollection was cleaning or wiping up something from the floor, which she believed to be blood. Everything thereafter was hazy to her. She stated that she does not clearly recall talking to any police officers or people around her, or being taken to any specific place or being given any tests, although she does remember something about removing her rings. The evidence covering this hazy period in the recollection of defendant will be discussed in greater detail later in this opinion when the question of the admissibility of defendant's oral and written statements and the results of the nitrate tests are considered.

Besides defendant and two character witnesses, the only other witness for the defense was Dr. Richard D. Kepner, a recognized psychiatrist. He testified that he had examined the defendant on two occasions after the fateful event for about an hour on each occasion; that these examinations consisted mainly of talking with her and checking information supplied by counsel. Dr. Kepner concluded that at the time of the trial defendant did not then remember what had happened on the night of January 16, 1959. He was unable to state just when this amnesia began, but that it was quite possible that the defendant was not aware of any acts she may have performed that night at the time of the killing. He further testified that it was possible to feign mental aberrations and forget-

fulness and pointed out that this was especially true where a person has a lapse of memory for a definite period of time.

The jury on May 9, 1959, after considering the evidence presented and the instructions of the court returned a verdict of guilty as charged of Murder in the Second Degree. A motion for new trial was denied on June 26, 1959, and defendant was thereafter sentenced to a maximum term of thirty years in Oahu Prison. Defendant now appeals from this judgment.

The first four assignments of error raise generally the subject of whether the verdict of the jury was contrary to the law, the evidence, and the weight of the evidence and pose only the question of the sufficiency of the evidence to support the verdict.

It is well settled in Hawaii that "a verdict cannot be set aside by this court merely on the ground that it is against the weight of the evidence and it must be upheld and a new trial refused if there is any substantial evidence, more than a mere scintilla, tending to support the findings necessary to the verdict rendered." *Territory* v. *Young,* 32 Haw. 628, 634. This rule has been stated in different ways by this court on many occasions. *Territory* v. *Lii,* 39 Haw. 574; *Territory* v. *Ebarra, et als.,* 39 Haw. 488; *Territory* v. *Schumacher,* 36 Haw. 567; *Territory* v. *Gagarin,* 36 Haw. 1; *Territory* v. *Lam Bo,* 23 Haw. 718; *Territory* v. *Chung Nung,* 21 Haw. 214; *Rep. Haw.* v. *Yamane,* 12 Haw. 189.

A review of the record in this case clearly indicates that there was ample evidence to support the verdict of the jury.

Francis Cecil Foster died as a result of a bullet wound in the midline of the neck at the level of the first clavicle vertebra. He had been shot in the back. His nude body was found lying on the first floor of the apartment. The

revolver was found on the second floor of the apartment. Pathologist Dr. Alvin Majoska testified that in his opinion the deceased, at the time of his death, was probably intoxicated and unconscious; that death was almost instantaneous; and that he "could not conceive the wound to have been self-inflicted." Tests conducted by Crime Laboratory Analyst Edward Tom led him to conclude that the wound was not a contact one and that the deceased was fired upon from a distance greater than 15 inches. Aside from Dr. Majoska's opinion, it seems clear from the very nature and location of the wound as established by the evidence that it was not self-inflicted.

There had been no forcible entry or disturbance of the apartment and the evidence pointed quite conclusively to a killing by someone within the apartment. There had been no unusual noises heard by the neighbor living in the adjoining duplex, save for the two loud noises spaced five or seven minutes apart about 10:00 or 10:30 P.M., which sounded like the backfire of a car.

Prior to the killing, the decedent and the defendant had been drinking; they had on many occasions in the past drunk together and quarreled; the defendant had threatened her husband (the deceased) on at least two or three occasions about a month before the killing.

There was evidence of blood having been wiped up throughout the apartment, especially in the living room, prior to the arrival of James Edson, the hospital corpsman.

The defendant was familiar with the fatal gun, having been taught to fire it by her husband when it was first acquired.

Faced with this evidence, counsel for the defendant has contended throughout that while it was, of course, possible still it was highly improbable, that the defendant intentionally killed her husband. He urges that the more logical interpretation of the facts was an accidental kill-

ing. This argument was undoubtedly made to the jury, and properly so, as this was a question for the jury and not for this Court to decide.

The courts have consistently maintained that an appellate court cannot invade the province of the jury with respect to determining the facts, and the verdict of the jury as dependent on the evidence is ordinarily taken as conclusive on the appellate court. 5A C.J.S., *Appeal and Error,* § 1647, p. 262; 26 Am. Jur., *Homicide,* § 500, p. 505. Merely because the evidence might also support the contentions of the defendant is no ground for a reversal since the jury may not have believed such supporting testimony, or may have rejected the contentions of counsel. "* * * It has long been the established rule in this jurisdiction that it is not a province of the appellate court to reconcile the evidence in any case or to disturb the verdict and judgment unless the same be clearly contrary to the evidence. * * *" *Territory* v. *Kinoshita,* 38 Haw. 335, 345.

In *State* v. *Donckers,* 200 Wash. 45, 93 P. 2d 355, the court observed at page 357:

"Whether circumstantial evidence tending to connect appellant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of appellant's guilt was a question for the jury, and not for the court.

" 'The weight of the evidence, whether direct or circumstantial, is a matter for the jury. When the evidence is of the latter kind, it is for the jury to say whether it excludes every reasonable hypothesis consistent with the innocence of the accused. * * *' "

And this court in *Territory* v. *Schumacher, supra,* held that a verdict of guilty will not be disturbed because of a mere conflict in the evidence where there was competent and substantial evidence to support it, pointing out at page 569 that this "court is not concerned with weighing

conflicting evidence or passing upon the credibility of witnesses, nor will it trespass upon the function of determining the ultimate facts, which is within the exclusive province of the jury, they having resolved the conflict in favor of the Territory and against the defendant by their verdict of guilty."

Consequently, there was no lack of sufficient evidence to sustain the verdict and the judgment would stand if there were no error in the remaining assignments of error to be considered.

Assignments of Error Nos. 5 and 6 allege that the trial judge erred in admitting into evidence, over objections, the statements, both oral and written, of the defendant and the results of the paraffin nitrate tests performed on the defendant. It should be noted that the objection was directed towards the manner in which the paraffin nitrate tests were conducted rather than to the inconclusiveness of the results.

The oral statements were made to James Edson, the hospital corpsman at the scene, and the other investigating officers, including Detective John Dickson and Officer Christopher Faria. The written stenographic statement was made by the defendant while being questioned by Detective Dickson at the Honolulu Police Department. Defendant contends that these statements were improperly admitted into evidence because "the defendant was not in a mental condition to appreciate what statements she was making to be able to freely and voluntarily make such statements."

R.L.H. 1955, § 222-26, provides: "No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that such confession was in fact voluntarily made * * *."

This court has consistently maintained that where there is more than a scintilla of evidence to sustain the

conclusion of the trial judge that the statement was voluntarily made the confession may be accepted into evidence. *Territory* v. *Patterson,* 38 Haw. 245. This is so even if the defendant was not warned that the confession would be used against him in court. *Territory* v. *Alcosiba,* 36 Haw. 231. Also, the fact that an admission or confession was made while in the custody of the police, or while in confinement under arrest, will not affect its admissibility, providing it was voluntarily made. *Territory* v. *Young and Nozawa,* 37 Haw. 189; *Territory* v. *Aquino,* 43 Haw. 347.

In *Territory* v. *Young and Nozawa, supra,* the holding was that where, upon a preliminary hearing to determine the voluntary character of a confession, the evidence is conflicting, findings of fact by the court, if supported by more than a mere scintilla of evidence, are conclusive upon the questions of admissibility. See also *State* v. *Ponteras,* 44 Haw. 71.

During the preliminary hearing out of the presence of the jury, the following evidence was presented for the trial judge's determination of the admissibility of these statements.

James Edson, the hospital corpsman who was the first to arrive at the scene, testified that when he went over to the body lying on the floor, the defendant sat on a coffee table nearby repeating, "My God, help him, help him. Don't let him die. Do something." When asked what had happened, the defendant said that he had fallen and hit his head. She kept repeating to herself, "My God, help him, help him. Don't let him die." A little later she said, "There's a gun in here some place. There's a gun some place." When asked by Edson who had called for an ambulance, the defendant replied, "I called Tripler." He testified that she also made these statements. "I've given him the ten best years of my life. Why did he do it? Why

did he do it? God help him." "We're both educated people. Why should he do this?" "I didn't mean to kill him. God help him. Don't let him die." Edson also testified that the defendant was not hysterical or erratic. She was straightforward in talking with no noticeable slurring of speech. He had no difficulty in understanding her. He had asked no questions except to inquire what had taken place and who had called for an ambulance.

Officer Christopher Faria, the first police officer on the scene, arrived at 1:45 A.M., and was with the defendant for about an hour. He testified that she was in the kitchen sobbing upon his arrival; that he asked her to keep her voice down as she was crying quite loudly. During the time he was there with her, she did most of the talking. Her statements included, "He forced me to drink. I don't like this stuff. He knows I don't like him to drink. He was mad with me." "He must have shot himself." "Please help me. Get him out of here. Get him out of here." "Maybe I shot him." "The chair is near the wardroom door. And if the gun is there, I must have shot him." "You know I smelled liquor on him." "I just knew it. I just knew he had been drinking again. I got mad with him. I didn't like that." "Oh, I don't know if I did it." She informed Officer Faria of the events that occurred from the time she was picked up at school where she was employed at about 2:00 o'clock the previous afternoon until the early part of the evening before. She mentioned the story of the gun itself—how it had been acquired and how her husband had taught her to use it. Officer Faria testified that he had no difficulty understanding her; that she was coherent throughout despite her crying and sobbing and although she appeared dazed and hysterical.

Edward Tom testified that he had accompanied the defendant, together with a police matron, to the police station and that although she appeared dazed and hyster-

ical, he could understand her clearly at all times. He also testified that at about 4:15 A.M., on the morning of January 17, 1959, at the Police Laboratory, after explaining the process to her, he asked the defendant if he could make a paraffin test on her hands to which she readily agreed.

Detective Dorr Barrett testified that he talked briefly to the defendant at the scene at about 2:45 A.M., the morning of the 17th of January. He again talked to her later that morning at the police station, at which time she gave a detailed account of the events of the day leading up to the killing. He, too, testified that he had no difficulty understanding her on either occasion; that although she had cried and seemed dazed and hysterical at the scene, she did not cry at the police station.

Detective John Dickson testified that he first talked to the defendant at about 5:00 o'clock the morning of January 17, 1959, at the Honolulu Police Station. She stated at that time that she wasn't sure what had happened, but remembered something about her husband being hurt. When told of his death she said, "I presume he is, because I am here." When asked what happened, she said, "I might have killed him. I don't know. I'm not sure." She then stated, in response to a question, that she did not recall anyone else being present in the apartment other than her husband and herself. In fact, she said that they had not had guests in their home for some time. She also stated that she had used the gun before, but did not recall using it the night before or that morning. Thereafter, with her consent, a stenographic statement was taken from her. After having read this statement the following day, she initialed each prior page and signed the last one.

The defendant testified that she remembered little about the events following dinner. She recalled having

finished the housework while her husband had gone to buy two bottles of bourbon whiskey. After the dinner dishes were cleared away, they sat down to talk and had a few drinks. She felt drowsy, and her next recollection was mopping up something from the floor. She next remembered being in the kitchen with people around her. Why these people were there or who they were she was not certain. She did not recognize any of the parties: Edson, Faria, Barrett, Tom or Dickson, who had already testified. She did not recall talking to anyone or anything that was said. She recalls being moved from place to place and something being said about removing her rings and something being put on her hands.

Psychiatrist Dr. Richard D. Kepner, called as a defense witness, testified that he had examined the defendant on two occasions subsequent to January 17, 1959. He further testified that amnesia means "forgetfulness to a degree that is pathological * * * and to an extent it amounts to really an illness or a symptom of an illness"; that although amnesia could develop from drinking alcohol, two or three drinks ordinarily would not induce amnesia, especially when the person is accustomed to drinking. He stated that a person in a state of amnesia would not be able to answer questions on events about which he had no recollection. He further said that a person can feign amnesia; this was especially so where the person tends to forget the essentials of a particular crime itself. He also pointed out that a person might know quite well what he is doing at the moment and directly afterwards suffer from amnesia.

After this preliminary hearing, the trial court admitted into evidence the statements and tests, holding that it was an "ultimate fact question" for the jury to determine whether they were voluntary or not. All of the foregoing testimony was again adduced before the jury.

The record clearly indicates that there was no evidence

of any force or any threats, any offers of immunity or hope of reward made by anyone to induce the defendant to give the statements or submit to the paraffin tests. In fact, most of the statements made at the scene were volunteered by the defendant without questioning by anyone. Defendant nevertheless contends that the statements and submission to the tests could not be voluntary since she was suffering from amnesia, which would, because of mental incapacity, make her statements involuntary as a matter of law.

The rule generally prevailing is that, in the absence of insanity or mental depletion at the time, neither the voluntary character of a confession or statement nor its admissibility is affected by the mental instability of the person making it. That condition is one for the consideration of the jury in determining the weight or effect to be given to the confession or statement. *McAffee* v. *United States,* 70 App. D.C. 142 (1939), 105 F. 2d 21; *Blackburn* v. *State,* 38 Ala. App. 143, 88 So. 2d 199; *People* v. *Rucker,* 11 Cal. App. 2d 609, 54 P. 2d 508; *People* v. *Duncan,* 72 Cal. App. 2d 247, 164 P. 2d 313; *Taylor* v. *State,* 225 Pac. 988 (Okla. Crim. App. 1924); *Vinzant* v. *State,* 28 Ala. App. 220, 180 So. 736; *People* v. *Kent,* 41 Misc. 191, 83 N.Y.S. 948; *People* v. *Miller,* 135 Cal. 69, 67 Pac. 12; *State* v. *Wise,* 19 N.J. 59, 115 A. 2d 62; *Dennison* v. *State,* 259 Ala. 424, 66 So. 2d 552; *State* v. *Bailey,* 233 La. 40, 96 So. 2d 34; 2 *Wharton's Criminal Evidence,* 12th ed., § 386, pp. 118-121; See *Annotation,* 69 A.L.R. 2d 348. "Evidence tending to establish that a confesser was ill or in a hysterical condition, and therefore not in full possession of his faculties at the time he confessed his guilt, does not affect the admissibility of the confession, but bears on the weight and effect to be given the confession. * * *" 2 *Wharton's Criminal Evidence,* 12th ed., *supra,* at p. 119.

In the *Blackburn* case, *supra,* the defendant had a history of mental disorders. A medical report, introduced

in evidence, stated that he had "recurrent periods of marked confusion and over-activity, assaultiveness with catatonic posturing, teeth grinding followed by severe headache and complete amnesia concerning his behavior, constitutes a threat to others when subject to such attacks." (p. 201.) Defendant there testified that he had no recollection of having signed the confession; that he did not remember being questioned by the sheriff or his deputy and did not remember that anything in the statement took place; that he did not commit the offense charged. In holding the confession admissible, the court at page 204 quoted from the *Dennison* case, *supra,* as follows: "* * * the mere fact that accused was not in full possession of his mental faculties when the confession was made would not render it inadmissible, but only affected its weight to be accorded by the jury; or was provable merely to support other evidence that the statement was not voluntary."

It is in connection with the latter portion of the foregoing quotation that the cases cited by defendant have any bearing. In those cases, there were external influences, not present in this case, such as inducement and fear and other factors, which together with lowered mental capacity rendered the confessions inadmissible as constituting "psychological coercion."

The defendant also advances the rather novel contention: "There was no positive evidence presented by the state that the confession was voluntary, other than testimony, that there was no force or threats, offers of immunity or hope of reward. The state put on no evidence as to defendant's mental competence to make the statements even though that was the sole issue and threats, force or offer of immunity were never raised by the defense. It is clear that Section 222-26 of the Revised Laws of Hawaii 1955, places the burden of proving the confessions

voluntary on the prosecution. This burden was never met, not even by a scintilla of evidence."

It was not up to the prosecution to anticipate and negative every possibility that the defendant was not physically or mentally competent or was legally incapable to make a voluntary confession or statement. *People* v. *Harrison,* 41 Cal. 2d 216, 258 P. 2d 1016; *Nail* v. *State,* 328 S.W. 2d 836 (Ark. Sup. Ct. 1959); *Dreher* v. *State,* 153 Tex. Crim. 398, 220 S.W. 2d 170; *Hinson* v. *State,* 152 Ga. 243, 109 S.E. 661; *Maynard* v. *State,* 106 Tex. Crim. 558, 293 S.W. 1104. *Cf., The King* v. *Paakaula and Kahauliko,* 3 Haw. 30; *Territory* v. *Wong Pui,* 29 Haw. 441; *Ah Fook Chang* v. *United States,* 91 F. 2d 805 (9th Cir. 1937).

The jury had the last say on the voluntary character of defendant's statements and the tests administered. "In this jurisdiction the rule has been recognized that although a court may, upon a hearing preliminary to the admission of a confession in evidence, determine that the confession was freely and voluntarily made where the evidence is conflicting, the ultimate determination of its voluntary character is for the jury." *Territory* v. *Young and Nozawa, supra,* p. 193. And the question of whether the statements of, and the tests administered to, the defendant were *understandingly* made or given was here left to the ultimate determination of the jury upon proper instructions. As to her written statement we cannot find therein any admissions that weren't likewise freely given by her while on the witness stand. We find no error in the admission of these statements and the results of the tests over the objection that they were involuntarily made or given.

The remaining question raised by defendant's opening brief in Assignment of Error No. 7 is whether the trial judge erred in refusing to give a requested instruction in identical terms with Territory's requested Instruction

No. 16 which was withdrawn.

This assignment of error deals with the ruling made by the trial judge that if defendant presented a requested instruction in identical terms with Territory's requested Instruction No. 16, the same would be refused. Territory's requested Instruction No. 16 is virtually a verbatim quotation of R.L.H. 1955, § 249-4, dealing with mental derangement. It provided as follows:

"I instruct you that it is the law of this Territory that any person acting under mental derangement, rendering him incompetent to discern the nature and criminality of an act done by him, shall not be subject to punishment therefor; provided, however, that he shall be responsible therefor, though the same be done in such state of mental derangement if such person voluntarily or heedlessly induced the mental derangement by intoxication."

Besides this requested instruction, there were three other instructions dealing with insanity. These were Territory's requested Instructions Nos. 15, 17 and 18. Instruction No. 18, in its original form, provided for a verdict of not guilty by reason of insanity. Instructions Nos. 15 and 17 were withdrawn and 18 modified to exclude a possible not guilty verdict by reason of insanity.

The proceedings to settle instructions had in chambers were only partially recorded, thus creating some confusion. They, however, indicate clearly that Territory's requested instructions on insanity were withdrawn on the understanding that defense counsel had stipulated that insanity was not a defense in this case.

Partial excerpts show the following to have transpired: In connection with Territory's requested Instruction No. 15, dealing with the requirement of a special finding by the jury on insanity at the time of the commission of the offense:

> "The Court: What are you doing on your instruc-
> tions on insanity?
> Mr. Fong: There is some evidence.
> The Court: You can tell the jury in your argu-
> ment.
> Miss Buck: I'll stipulate to that.
> Mr. Fong: (To Miss Buck) Will you stipulate
> that insanity is not a defense?
> Miss Buck: Yes."

Again, in connection with Territory's requested Instruction No. 17, defining legal insanity:

> "Mr. Fong: Let's pass this '17'.
> The Court: How about 'mental condition?'
> Miss Buck: Then we're getting into insanity.
> Mr. Fong: I will withdraw this Instruction '17'
> since insanity is not an issue."

The defense instruction dealing with the sanity of the defendant was Defendant's requested Instruction No. 9, which provided in part as follows:

> "The burden of proof, as those words are used in criminal cases, is never upon the accused to establish her innocence or to disprove the facts necessary to establish the crime for which she was indicted. This burden is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime, *including the sanity of the Defendant.*" (Emphasis added.)

Again, the record shows defense counsel at that time did not feel that the sanity of the defendant was in issue:

> "The Court: Defendant's '9'?
> Mr. Fong: We're talking about the sanity of the
> defendant.
> Miss Buck: That was in complete error.
> The Court: What was that?

Miss Buck:  The last sentence in the first para-
graph, that just crept in.

Mr. Fong:  (To Miss Buck) Are you withdraw-
ing Defendant's '9'?

Miss Buck:  It's a more positive one. The defend-
ant doesn't have to prove herself in-
nocent.

Mr. Fong:  That's the Court's number '7'. The
burden is never on the defendant to
prove herself innocent. It is all in-
cluded in the last sentence.

Miss Buck:  All right. Withdrawn.

The Court:  Withdraw '9'."

Territory's Instruction No. 18, as amended and given
by agreement, provided as follows:

"I further instruct you that you may bring in,
under the charge against the defendant in this case,
either of the following verdicts as the facts and cir-
cumstances in evidence under the law as given you in
these instructions may warrant:

1. Guilty as charged, or
2. Guilty of manslaughter, or
3. Not guilty.

Any verdict you may bring in must be unanimous."

This instruction was the same in substance as Defend-
ant's requested Instruction No. 16 which was subsequently
withdrawn. Further, the forms of verdicts furnished the
jury, approved by counsel, were three in number, provid-
ing for the same verdicts covered by this Territory's In-
struction No. 18, as amended.

Defendant contends that her affirmative answer to the
question, "Will you stipulate that insanity is not a de-
fense?" was "meaningless since insanity is always a defense
and one cannot change the law of the land by stipulation."
This is merely a hair-splitting use of semantics. The inten-

tion was clear that the reference was only to this case.

Defendant further denies that there was a stipulation that insanity was not in issue. She points out that when she was asked if she would stipulate that insanity is not an issue she replied: "I don't know. I mean to say—I will stipulate that insanity — they don't know whether drunkenness is a defense which negatives that." And again when asked "Will you stipulate that insanity and mental derangement are not a defense?" her reply was "No." It is unfortunate that all of the discussion with regard to Territory's requested Instruction No. 16 is not fully set forth in the transcript. However, from what does appear in the record, it is clear that this requested instruction was withdrawn only after defense counsel had given the prosecutor and the court to understand that insanity was not in issue as a defense and after all other instructions relating to the question of the sanity of defendant had been settled. As was stated in *Hogan* v. *Watkins*, 39 Haw. 584, at page 586: "'* * * That admission, as long as the stipulation stands, is conclusive. * * *'"

However, a stipulation made inadvertently, inadvisedly or improvidently should be permitted to be withdrawn by the court when inequity will result to one side and the other party will not be prejudiced thereby. 50 Am. Jur. Supp., *Stipulations*, § 14, p. 46; 83 C.J.S., *Stipulations*, § 34, p. 88; *Cf., Cooke Trust Co. Exec.* v. *Edwards, et al.*, 43 Haw. 226.

"It has very generally been held that the courts, by reason of the large equitable powers which they have over their own proceedings, and the discretion vested in them, may relieve against stipulations inadvertently, inadvisedly, or improvidently entered into which will operate inequitably and to the prejudice of one of the parties, provided all the parties may be placed in the condition in which they were before the stipulation was made." 83 C.J.S.,

*Stipulations,* § 35(3), p. 92; and see extensive *Annotation* in 161 A.L.R. 1161, 1180. Although therein used in a civil matter, the principle is equally applicable to criminal actions.

The withdrawal of Territory's requested Instruction No. 16 was the last prosecution instruction considered at the hearing on the settlement of instructions on May 8, 1960. At that time the following colloquy developed:

"The Court: Territory's '16'—you don't want that?

Mr. Fong: I will withdraw it.

Miss Buck: The defense, then, has a request to make—

Mr. Fong: What are you talking about? We're withdrawing it.

Miss Buck: The defense will withdraw its objections to '16' and—

Mr. Fong: You're asking for this now?

Miss Buck: Yes.

Mr. Fong: Then we'll ask for all instructions on insanity.

The Court: This instruction is withdrawn—Territory's '16'—and the motion for a similar instruction is denied.

Miss Buck: Exception."

It can be seen that upon defendant's request for Instruction No. 16, "all instructions on insanity" were asked for by the Territory, which would include Territory's requested Instructions Nos. 15 and 17 as well as Territory's original Instruction No. 18, the form of verdict instruction which included, among four possible verdicts, one of not guilty by reason of insanity. By implication defendant joined in this request for all insanity instructions; the trial court denied the request. Thus, by this request, defendant withdrew her stipulation that insanity was not a defense or was not in issue in this case.

Can we say that defendant was prejudiced by the trial court's refusal to heed her request. In other words, does the record disclose any evidence of insanity on the part of defendant at the time of the killing which the jury could have considered.

In Hawaii, emotional insanity, unassociated with a disease of the brain, as defined below, is not an excuse for a crime. In order to constitute a defense under R.L.H. 1955, § 249-4 (Territory's requested Instruction No. 16), the mental derangement under which the defendant acted at the time of the commission of the alleged offense must be caused by or be the effect of a disease of the brain rendering her incompetent to discern the nature and criminality of the act done by her. *Territory* v. *Alcosiba,* 36 Haw. 231. "Mental derangement, as indicated by the term itself, denotes a disordered or unsound mind. It is interchangeable in meaning with the word 'insanity.' Many authorities have referred to insanity as a disease of the mind. However, it is now generally conceded that insanity or mental derangement is rather the result or manifestation in the mind of a disease of the brain, and by disease is meant any underdevelopment, pathological condition, lesion or malfunctioning of the brain or any morbid change or deterioration in the organic functions or structure thereof." (ibid, p. 238.)

The sanity or insanity of the defendant is a question for the jury's sole determination. R.L.H. 1955, § 258-37. Further, defendant's plea of not guilty controverted and put in issue her sanity at the outset of the trial which was a fact to be determined by the jury upon the presentation of any credible evidence, however slight, on this issue. *Territory* v. *Adiarte,* 37 Haw. 463.

In *Territory* v. *Alcantara,* 24 Haw. 197, this court ruled that where there is some evidence, however weak and unsatisfactory, adduced by the defendant raising an issue

of fact, this issue should be submitted to the jury by an appropriate instruction.

An examination of the record discloses that the defendant had adduced evidence from which the jury might have found her suffering from a disease of the brain rendering her incapable, at the time of the crime, of knowing right from wrong or the nature and criminality of any act she may have performed. There was the testimony of the defendant herself that she knew nothing of the events that caused the death of her husband even though she almost certainly was in the apartment at the time of the killing. In corroboration, Dr. Kepner testified that, based on his examination of the defendant, it was his belief that she did not have any knowledge of the events of the shooting. Defendant also testified that she had had a history of "blackout" spells from early childhood down to a period shortly before the killing where she would perform acts without knowing what she was doing at the time, and these "blackout" periods seemed to recur more frequently and during the year previous to the killing she had had several attacks. She stated that on about three occasions she "was in a coma for several weeks at that time" and in general that "[sometimes] it was more than a dizziness and not knowing exactly where I was. Other times, I wouldn't be conscious of exactly how long they had lasted." She testified that she "felt [she] couldn't go on teaching because evidently I had had these blackouts," and she had had to leave school on occasions because of them. When asked how long these "blackouts" lasted she replied, "Well, sometimes it would be, as I would recall, several hours" although she didn't "remember that it was more than 24 hours."

It is the prosecution's contention that the *Alcosiba* case is controlling and requires a holding that there was insufficient evidence in this case to warrant submission of

the insanity issue to the jury. We think, however, that the facts upon which the *Alcosiba* decision was based are not at all comparable to the facts presented by the record in this case. In the *Alcosiba* case there was only "a single incident of transient loss of memory occurring at the time of the criminal act." This was held insufficient to support an insanity plea. Here, as has been indicated, there was testimony which, if accepted, tended to prove a history of prior mental confusion and manifestations of a disordered mind. The factual distinction between the two cases is significant and makes the ruling of *Alcosiba* inapplicable to this case as appears quite clearly from the language of that decision, at page 239:

> "In order to justify the submission of the defense of mental derangement to the jury, there must therefore be some evidence showing or tending to show mental derangement caused by or the effect of a disease of the brain.

> "No such evidence was produced. There was not the slightest attempt to prove an impairment of the brain nor an abnormal condition of the mind nor any manifestation thereof.

> "The record contains no evidence tending to show that the defendant was ever childish, incoherent or irrational in his speech, ever unnatural or abnormal in his actions, ever queer or abnormal in his appearance, or ever had fits, trances, delusions or hallucinations, or ever betrayed a confusion of mind as to time, place or person, or ever displayed any other manifestations of a disordered mind. * * *"

Dr. Kepner testified that the defendant, whom he had examined has some dissociative trends as he stated "I think that Mrs. Foster is suffering from or at least displays evidence of a psychoneurotic reaction, including some anxiety, some depression or some tendencies to a

conversion; that is, to changing certain emotional conflicts into physical or bodily symptoms. * * * And also some dissociative trends"; that she had a personality that was more apt to dissociate; that a person suffering from dissociation could do things without being fully aware of what they were doing, saying "In other words, if a dissociation is due to a major mental illness such as schizophrenia or dementia praecox, and if the person while having schizophrenia or dementia praecox committed an act and subsequently developed a dissociation and forgetfulness, that person then might well be considered mentally sick and therefore not really knowing right from wrong at the time of the offense, even though the amnesia developed after the dissociation" and also, in answer to a question whether a major illness was a condition precedent, that "* * * it is true, I think, that sometimes even in minor disorders, one may have conditions that do render the person incapable of discriminating right from wrong and weighing a situation accurately and coming up with an accurate judgment" and again referring to the defendant, "there certainly would be less awareness, appreciation, and understanding if a person were in one of the dissociated states during the alleged time of the alleged offense"; that, in his opinion, the defendant did not know what went on in the apartment the night of the shooting and that the defendant quite possibly was not aware of any acts she may have performed that night at the time she was performing them.

The defendant's evidence, primarily directed towards the issue of the voluntariness of her statements and submission to the nitrate tests, also raised an issue of the fact of her insanity and it was error of the trial court to refuse to submit this issue to the jury under the requested instructions. It is not for this court, nor was it for the trial court, to determine the weight and credibility of the

evidence on the issue of her sanity, but for the jury and the jury alone. It appears that the prosecution thought so at the trial as evidenced by its requested instructions on the question of insanity.

No prejudice whatsoever could have resulted to the Territory by the withdrawal of the stipulation and the most serious disadvantage and prejudice resulted to the defendant by the refusal of her right to the defense of insanity.

For the reasons last stated, the judgment and sentence must be set aside and a new trial granted.

The concurring opinion predicates the reversal of the judgment on the giving of Prosecution's Requested Instruction No. 6. By it, the jury was instructed in the language of R.L.H. 1955, § 291-2, that malice shall be presumed on proof of the act of killing another and that the burden of overcoming such presumption was upon the accused.

In *Territory* v. *Cutad,* 37 Haw. 182, at p. 188, it was pointed out that "the provisions of the statute are not applicable to every case of murder and care should be exercised in its use" and, further, that where the presumption is properly applicable, an instruction reciting the statute should be accompanied by supplemental instructions, construing the word "presumed" and the word "burden." No instructions of that nature were given in this case.

Although the instruction was given over the objection and exception of the defendant, the trial court's ruling was neither properly assigned as error nor pursued by the appellant in her briefs or in oral argument in this court. There is also a serious question on whether the defendant's request for an instruction embodying the statutory presumption (Defendant's Requested Instruction No. 17) constituted a waiver of any error based on

the giving of the prosecution's Instruction No. 6.

Under the circumstances related and in view of the disposition made of this case, the majority of the court do not deem it necessary or proper to deal with the point beyond reaffirming the admonition of the *Cutad* case, *supra*. Having done this, we should be able to assume that on retrial of this case the admonition will not again be disregarded.

Reversed and remanded for a new trial.

*Axel Ornelles* for plaintiff in error.

*Arthur S. K. Fong*, Assistant Prosecuting Attorney, for defendant in error.

### CONCURRING OPINION OF LEWIS, J.

I concur in the order of reversal, but on a different ground. In my view there was plain error in the giving of Prosecution's Instruction No. 6 over objection and exception. Despite procedural defects we should notice this error under the circumstances present here.

On the afternoon of May 7, 1959, the court considered nineteen requested instructions submitted by the prosecution, and sixteen submitted by the defense. At that time Prosecution's Requests Nos. 6 and 8 were granted over objection. Appended to this opinion is a note setting out the portions of the charge mentioned in this opinion, together with the record pertaining thereto.

The matter of settlement of instructions was adjourned to the morning of May 8, at which time the defense evidently renewed the objection to Prosecution's No. 6, since the giving of the instruction at the prosecution's request over objection of defendant again appears in the minutes. Immediately thereafter the defense offered its No. 17, which was presented for the first time on May 8 and consisted of two paragraphs, of which the first repeated Prosecution's No. 6 and was stricken. As so modified the

instruction was given by agreement. The retained second paragraph is quoted in the appended note.

This attempt to cure an error did not go so far as to waive the error. See *Crosby* v. *State,* 169 Ark. 1058, 277 S.W. 523; *People* v. *McGrath,* 94 Cal. App. 520, 271 Pac. 549 (D.C.A. 1st Dist.). In view of the renewal of the objection to Prosecution's No. 6 the court could not have supposed that the first paragraph of Defendant's No. 17 was offered by defendant or agreed to, the evident purpose being to offer the second paragraph to follow immediately after Prosecution's No. 6, as was done. There were court's instructions on reasonable doubt, and the addition was without significance.

This is not such a case as *Mossman* v. *Sherman,* 34 Haw. 477, in which the jury was charged, at the instance of defendant, that plaintiff's attorney rightfully propounded to jurors the very question which, on appeal, it was asserted should have caused the entry of a mistrial at the inception of the trial. Previously the jury had been instructed to disregard the question, and defendant was not in a position to urge that the jury was unable to disregard that which defendant thereafter chose to bring before them.

Nor does the present case resemble *Glover* v. *Fong,* 42 Haw. 560, 567, in which it was found that defendant had stipulated to the giving of certain additional instructions in response to questions asked by the jury. Nor does it resemble *Phillip Levy & Co.* v. *Davis,* 115 Va. 814, 80 S.E. 791, cited in *Glover* v. *Fong, supra,* in which, at the request of plaintiff-seller the jury was charged that an agreement between the seller and buyer for an illegal use of the property sold would be a defense to the contract, and consequently was held estopped to question this rule, it being no excuse that an instruction in different terms previously had been requested by plaintiff and refused.

Without departure from the rule well stated in *Glover* v. *Fong, supra,* that:

"A party may not, on appeal, question any error of the trial court brought about by his invitation, except as to errors that are jurisdictional."

we may review Prosecution's No. 6.

This leaves for consideration procedural defects which did not invite error in the court below but do raise the question whether we may review Prosecution's No. 6.

Rule 3(b)(4) of this court requires a specification of errors relied upon, and when the error alleged is the charge of the court, the specification is required to set out the part referred to *totidem verbis,* together with the objections urged at the trial. There was no specification relating to Prosecution's No. 6.

An exception not specified is deemed abandoned. *Territory* v. *Pierce,* 43 Haw. 246, 249, reh'g den. 43 Haw. 287; *Territory* v. *Santana,* 37 Haw. 586; *Territory* v. *Meyer,* 37 Haw. 102, aff'd 164 F. 2d 845; *Territory* v. *Warren,* 35 Haw. 232, 241, aff'd 119 F. 2d 936; see also *Territory* v. *Martin,* 39 Haw. 100, 110. However, prior to *Territory* v. *Meyer* the court waived the rule on occasion. *Territory* v. *Taok,* 33 Haw. 560; *Lawson* v. *Lawson,* 36 Haw. 528; *Cabrinha* v. *Hilo Tribune Herald,* 36 Haw. 355, 360; *Furtado* v. *Rezents,* 33 Haw. 569; *Territory* v. *Honolulu Rapid Transit,* 23 Haw. 387, 391; *Looney* v. *Trent Trust Co.,* 23 Haw. 208, 212.

Some courts state in their rules that errors not specified will be disregarded "save as the court, at its option, may notice a plain error not assigned or specified," to quote as an example the rule applied in *Sibbach* v. *Wilson & Co.,* 312 U.S. 1, 16. We have not had, prior to the adoption of the new Hawaii Rules of Criminal Procedure, Rule 52(b), any provision concerning the noticing of "plain error." The new rules are not involved, since the present appeal

is from a judgment entered prior to July 1, 1960. It is worthy of note, however, that under Rule 30 of the Hawaii Rules of Criminal Procedure, as under Rule 51 of the Hawaii Rules of Civil Procedure, counsel has the responsibility of objecting or agreeing to the instructions upon the settlement thereof. These rules are notably different from their federal counterparts.

Even without a rule on the subject, we could, and in this case should, follow the practice of noticing, at our option, a plain error though not specified. We possess the power to waive Rule 3(b)(4), just as it was waived prior to *Territory* v. *Meyer*. While it would be a grave mistake to return to the indulgence shown before *Meyer*, a waiver is called for in this case.

Rule 3(b)(3) also should be noted. It provides that ordinarily this court will not consider a point which is not "set forth in or necessarily suggested by the statement of questions involved," which statement is a required part of appellant's brief. But the fact that the rule reads "ordinarily" indicates that this is not a hard and fast rule.

Both paragraphs of Rule 3(b) are for the protection of this court and to place on counsel the responsibility of shaping the case. But it may happen that in considering a point raised—here the sufficiency of the evidence to sustain the verdict—this court comes upon a plain error affecting substantial rights, preserved at the trial but not properly brought before us under our rules. The giving of Prosecution's No. 6 was such an error.

It would assist rather than hinder the court to notice this error. Here is a case in which the jury could have found but did not find a reasonable doubt of the existence of malice, an essential ingredient of the crime of murder, second degree, of which defendant was convicted. Without malice defendant was at most guilty of manslaughter.

The jury was instructed to presume the malice, unless it was negatived by proof adduced by the defendant. The jury should not have been so instructed because in the evidence adduced by the prosecution there were circumstances which might have raised a reasonable doubt of the existence of malice in the minds of the jury. We cannot say that, though the jury could have found that these circumstances raised a reasonable doubt, it was within the province of the jury to find and the jury did find otherwise. If the jury made any finding on the point, that finding depended upon the weight given by the jury to the defense testimony to rebut what the defendant should not have been called upon to rebut without the jury considering the circumstances brought out by the prosecution.

Hence the instruction as to the presumption interfered with the jury's functions, and the verdict of the jury should not be deemed the end of the matter. *Morissette v. United States*, 342 U.S. 246, 276. The error in the giving of Prosecution's No. 6 was "plain error." *Knihal v. State*, 150 Neb. 771, 36 N.W. 2d 109; *United States v. Hines*, 256 F. 2d 561, 564 (2d Cir. 1958); *Phelps v. United States*, 252 F. 2d 49 (5th Cir. 1958).

Prosecution's Instruction No. 8 also refers to the statutory presumption of malice. There was an objection to that instruction but no exception, and under R.L.H. 1955, § 212-14, the court can not review No. 8. The statute is binding on the court under the law applicable to this case, i.e., the law prior to the adoption of the new Rules of Criminal Procedure. *Territory v. Gomes*, 38 Haw. 304, 308; *Territory v. Pierce, supra; State v. Yoshida*, 44 Haw. 81. However, Prosecution's No. 8 is nowhere near as prejudicial as No. 6.

Prosecution's No. 6 was in the words of the statute, R.L.H. 1955, § 291-2, which reads:

"When the act of killing another is proved, malice

aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor."

This provision was enacted by section 2 of the Act of June 30, 1860, S.L.H. 1860, p. 15. The statute takes its meaning from the common law. See *Territory* v. *Scully,* 22 Haw. 618, 629.

In *Territory* v. *Cutad,* 37 Haw. 182, the court sounded an emphatic warning against the indiscriminate use of an instruction in the words of the statute. Though finding it unnecessary to pass on the instruction, the court said:

"* * * Cases are conceivable in which the provisions of the statute are applicable and that an instruction embodying its provisions might be appropriate if accompanied by supplementary instructions construing the word 'presumed' and the word 'burden.' But the provisions of the statute are not applicable to every case of murder and care should be exercised in its use. It would serve no useful purpose at this time for us to express our views upon the subject but enough is said in 2 McClain on Criminal Law, sections 332 and 333 and the cases cited on page 300, note 3, and page 303, note 1, to give food for thought." (37 Haw. at p. 188.)

Previously, in *Territory* v. *Buick,* 27 Haw. 28, 57, an instruction in the words of the statute was deemed inapplicable and harmless when:

"* * * there was no evidence in the case permitting a finding by the jury that the killing was without malice aforethought. Upon the evidence as it stood, it was compulsory upon the jury, if it believed that the defendant did the shooting, to find that the killing was with malice aforethought and that the offense was murder. Under these circumstances, the giving of an

instruction concerning the statutory presumption of malice in such cases could not possibly have been prejudicial to the defendant."

At common law: "The fact of the killing being first proved, the law presumes it to have been founded in malice, unless the contrary appears." This is "a rule of evidence to the effect that if the homicide is proved, and the evidence adduced to establish it shows neither mitigation nor justification, malice will be presumed from the proof of the homicide; * * *. If the evidence adduced to establish the homicide presents two conflicting inferences, one of malice and the other an absence of malice, then it becomes a question of fact, to be decided by the jury, as to which aspect of the evidence is the real truth of the occurrence." *Mann* v. *State,* 124 Ga. 760, 53 S.E. 324, annotated 4 L.R.A., N.S. 934; *Erwin* v. *State,* 29 Ohio St. 186, 191; Wharton, *Homicide,* 3d ed., § 94, p. 117, note 5, § 104, pp. 142-143; 1 McClain, *Criminal Law,* §§ 332 and 333.

Speaking of the origin of the presumption, Moreland states in his work on *Homicide,* pp. 11-12:

"The starting point seems to have occurred in cases of sudden killing without apparent provocation. In such situations the state of mind being subjective and undisclosed and undiscoverable except by an interpretation of the facts, the law inferred a concealed motive and previous malice. Lambard, writing in 1581, states: '. . . many times the law [judges the] malice which lurked before within the party, . . . and therefore if one suddenly and without any outward show of present quarrel or offence [draws] his weapon and . . . [kills] another . . ., the law [judges] it to have proceeded of former malice, meditated within his own mind, however it [is] kept secret from the sight of other men.' "

Accordingly, when the prosecution's evidence discloses

circumstances from which the jury might infer provocation reducing the homicide to manslaughter—though it might not so infer—the jury should not be charged as to the presumption unless coupled with a statement that the evidence which proves the killing may rebut the presumption. 4 Warren, *Homicide*, Perm. Ed. § 324, pp. 60-63, notes 22-28, p. 70, notes 62-63; 1 McClain, *Criminal Law*, §§ 332 and 333; 26 Am. Jur., *Homicide*, §§ 307 and 536; 40 C.J.S., *Homicide*, §§ 23, 28; 41 C.J.S., *Homicide*, § 357b; *State* v. *Hayden*, 131 Iowa 1, 107 N.W. 929; *Turner* v. *State*, 16 Tex. Cr. Rep. 378, 392; *Hornsby* v. *State*, 94 Ala. 55, 10 So. 522, 526; *Anders* v. *State*, 255 Ala. 319, 51 So. 2d. 711; *State* v. *Trivas*, 32 La. Ann. 1086, 36 Am. Rep. 293; *Green* v. *State*, 124 Ga. 343, 52 S.E. 431; *Darden* v. *State*, 73 Ark. 315, 84 S.W. 507; *Gamblin* v. *State*, 29 So. 764 (Miss.); see also *State* v. *Boggs*, 129 W. Va. 603, 42 S.E. 2d 1, 8 (reviewing the cases on this subject but reversing on other grounds); *State* v. *Holbrook*, 232 N.C. 503, 61 S.E. 2d 361 (finding no reversible error in the particular case); but *cf. State* v. *Mangino*, 108 N.J.L. 475, 156 Atl. 430; *State* v. *Corrado*, 113 N.J.L. 53, 172 Atl. 571, *State* v. *Williams*, 29 N.J. 27, 148 A. 2d 22.

For cases in which an instruction as to the presumption has been approved when qualified so as to make it plain that the mitigating circumstances may be found in the prosecution's evidence, see *Mann* v. *State, supra; Whitfield* v. *State*, 209 Ga. 804, 76 S.E. 2d 405; *Commonwealth* v. *Bedrosian*, 247 Mass. 573, 142 N.E. 778; *State* v. *Alexander*, 30 S.C. 74, 8 S.E. 440; *Wallen* v. *Commonwealth*, 134 Va. 773, 114 S.E. 786; *Scott* v. *Commonwealth*, 143 Va. 510, 129 S.E. 360; *Saulsbury* v. *State*, 83 Okla. Cr. 7, 172 P. 2d 440. While these cases are correct in principle, in some the language of the particular instruction may have been subject to criticism.

In *State* v. *Copenbarger*, 52 Idaho 441, 16 P. 2d 383,

a conviction of murder in the second degree was reversed because of a charge of the presumption which was contradictory and failed to convey the correct rule, embodied in the Idaho statute but not clearly set forth in the instructions. There, as here, the state took the position that the presumption was sufficient to sustain the conviction. The court said:

"Where the state's case is bare of exculpatory evidence, there is no question as to the application of the rule contended for by the Attorney General. * * *.

"* * * The difficulty with the state's position is that it seeks the benefit of the presumption, even though it presented evidence in extenuation." (p. 385) Quoting the California rule the court said further:

"* * * If the proof on the part of the prosecution tends to show that the homicide amounts only to manslaughter, * * * then no burden is placed on the defendant to prove any circumstances of mitigation, * * *.

"We do not mean to say that, under the circumstances, the jury is required to believe the exculpatory matter * * *. The only effect of the rule is to deprive the state of the benefit of the presumption of malice. * * *." (p. 387)

For the California rule, see *People* v. *Deloney*, 41 Cal. 2d 832, 264 P. 2d 532, 537, in which the court referred to Penal Code 1105, which, like the Idaho statute, is more complete than our statute, since the shifting of the burden to the defendant is conditioned upon absence of proof on the part of the prosecution tending to show that the crime is manslaughter. However, the court stated:

"This court has held repeatedly that a jury should not be instructed in the language of section 1105. * * *.

"* * * If the jury is instructed in the words of the statute alone, it may be misled into construing the 'burden of proving circumstances of mitigation' as

imposing upon the defendant the burden of persuasion and into believing that mitigating circumstances do not exist unless the defendant proves the existence of such circumstances by a preponderance of the evidence." See also *People* v. *Carson,* 43 Cal. App. 2d 40, 110 P. 2d 98, 100 (D.C.A. 2d Dist.).

In the present case, from the prosecution's own evidence the jury might have found mitigating circumstances. The prosecution identified the gun and showed that two bullets had been fired, of which one passed through the front door, striking the hinge. The evidence that deceased fired this other shot was at least as good as that defendant fired it, unless discounted because of the evidence that deceased had enough alcohol in his blood to render him unconscious. But the jury might have rejected the view that deceased was unconscious when this other shot was fired. Dr. Majoska testified that a man with the alcoholic content in his blood that deceased had would be unconscious in 90% of such cases, not 100%. Furthermore, there was no testimony as to the particular time at which deceased must have been rendered unconscious. He was nude, and the two piles of clothes found on the first floor were not identified as his though this clearly could have been done, if they were his, since a description of what he had been wearing had been obtained from defendant. If deceased went upstairs, disrobed and returned downstairs, he by the same token could have remained conscious long enough to have fired the shot through the front door. The gun was kept in a closet upstairs. There was nothing to show that defendant was upstairs before the homicide occurred. It was established that defendant was upstairs after the homicide occurred. Only the defendant could have returned the gun to the shelf in the closet. Her oral statements to police at the scene indicated that she stood on a chair to reach the shelf in the closet, but were of no

particular significance in shedding light on the question of who brought the gun downstairs. The paraffin nitrate test indicated the presence of some nitrate substance on both of deceased's hands. If it was deceased who brought the gun downstairs and he suddenly appeared with it after he had disrobed and was supposed to have retired, he might well have put defendant in fear. If a struggle ensued during which the shot through the front door was fired, the five to seven-minute interval between the two shots might have been deemed by the jury insufficient to divorce the homicide from the provocation. The jury could have believed the homicide was no accident, yet believed that defendant, due to adequate provocation, was in a state where she was beyond the control of reason when she fired the fatal shot.

The charge in the words of the statute, presuming malice and placing upon the defendant the burden of showing extenuating circumstances without qualification, withdrew from the jury's consideration the prosecution's evidence concerning the surrounding circumstances and should not have been given for that reason. The instruction in the words of the statute should not have been given for the additional reason well stated in the California case of *People* v. *Deloney, supra.* For even in a case in which the evidence put on by the prosecution shows an intentional killing by the defendant without any showing of mitigating circumstances, so that the burden of proof does in fact shift to the defendant, still the jury cannot be expected to understand the niceties of a shifting burden of proof without explanation. The jury is to find upon all of the evidence whether there were mitigating circumstances or evidence thereof sufficient to raise a reasonable doubt as to the existence of malice.

Considering the evidence and the charge as a whole, I am of the view that the jury could not have but con-

cluded that the prosecution had a complete case of second degree murder as a matter of law, without any finding upon the part of the jury other than that it was the defendant who killed the deceased. I would reverse on the ground of the error in the giving of Prosecution's Instruction No. 6 over objection and exception.

### Note
#### *(Appended to concurring opinion of Lewis, J.)*
Excerpts from the charge to the jury:

Pros. #6. Settled May 7, '59 over objection; exception taken and error assigned

"Under the laws of the Territory of Hawaii when the act of killing another is proved, malice aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor.

Deft's. #17. Requested and Settled May 8, '59, as modified, by agreement

"In this connection, I further instruct you that before you can consider this presumption the Territory must have proven, upon all the evidence and beyond a reasonable doubt, that it was the Defendant who killed the deceased.

Pros. #8. Settled May 7, '59 over objection; no exception taken; error assigned

"Voluntary intoxication affords no excuse, justification or extenuation of a crime committed under its influence. It, however, may be a defense where a specific intent is an essential ingredient of the crime charged. In such cases it is relevant to show that the degree of intoxication was such that the accused could not have formed the required intent. Thus, in the instant case, if you find the defendant to have been intoxicated at the time of the offense, said intoxication will not excuse or justify the killing of Francis Cecil Foster. It may be used merely to show that the defendant may not have had the malicious intent requisite for the of-

fense of murder in the second degree. It will not, however, excuse the Defendant for the offense if such malice was present, or if you find that the statutory presumption of its presence has not been rebutted."